| | |
|---|---|
| **DISTRICT COURT, DOUGLAS COUNTY, COLORADO**<br>4000 Justice Way<br>Castle Rock, CO 80109 | DATE FILED: January 15, 2021 1:17 PM<br>FILING ID: C9FE385991E5B<br>CASE NUMBER: 2021CV30041 |
| **PARKER POWERSPORTS INC.**<br><br>**JOHN ALLEN**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**TEXTRON SPECIALIZED VEHICLES INC.**<br><br>**JOEL RANUM**<br><br>**Defendants.** | **^ COURT USE ONLY ^**<br><br>Case Number: ______________<br><br>Div.:_____ Ctrm:_____ |
| David. W. Edgar<br>Edgar Law Firm, LLC<br>Telephone: (720) 529-0505<br>Fascimile: (303) 486-0001<br>dwe@edgarlawfirm.com<br>Colorado Bar # 41956<br>[See additional counsel on signature page.] | |
| **COMPLAINT** | |

COME NOW Plaintiffs Parker Powersports Inc. and John Allen (collectively "Plaintiffs"), by and through the undersigned counsel, and for their Complaint against Defendants Textron Specialized Vehicles Inc. and Joel Ranum (collectively "Defendants"), allege as follows:

## INTRODUCTION

1. Defendant Textron Specialized Vehicles Inc. ("Textron") used a one-sided and predatory franchise agreement when it lured Colorado powersports dealerships to market and sell its line of "Arctic Cat" and "Textron Off Road"-branded powersports vehicles; dealerships

it would later leave high and dry when Textron abruptly altered its market strategy and secured what it saw as more lucrative business relationships elsewhere.

2. In addition to its predatory franchise agreements, false promises, and other misrepresentations, Textron employed high pressure sales representatives, such as Defendant Joel Ranum.

3. Textron thought it could get away with this because it believed the language drafted into its contracts would protect it from legal recourse for its actions—actions that would otherwise expose Textron to a wide array of claims under Colorado law.

4. Textron, however, was either blithely unaware of or knowingly cavalier about the fact that Colorado law invalidates the choice of law and choice of venue provisions that Textron believed shielded it from liability.

5. Plaintiff Parker Powersports (and its owner Plaintiff John Allen) was a Colorado powersports vehicle dealership that had the misfortune of entering such a franchise agreement with Textron and has since suffered grave economic damages.

6. By this lawsuit, Plaintiffs seek to recover their losses from Textron.

**PARTIES**

7. Plaintiff Parker Powersports Inc. ("Parker Powersports") was a business entity located at 15690 Parkerhouse Road in Parker, Douglas County, Colorado. Parker Powersports sold and serviced powersports vehicles including motorcycles, all-terrain vehicles ("ATVs"), utility task vehicles ("UTVs" or "side-by-sides"), and snowmobiles. At all times relevant to this

Complaint, Parker Powersports was a "powersports vehicle dealer" under Colo. Rev. Stat. Ann. § 44-20-402(12) and its predecessor, § 12-6-502(11).[1]

8. Plaintiff John Allen is a resident of Aurora, Colorado. Allen founded, funded, managed, and owned Parker Powersports.

9. Defendant Textron is a subsidiary of "Textron Inc.," which is based in Providence, Rhode Island. Textron's headquarters is in Augusta, Georgia. Textron's product line includes brands such as Cushman, E-Z-GO, Arctic Cat, Jacobsen, Ransomes, TUG, Douglas, Premier, Safeaero, and Textron Motors. Now and at all times relevant to this Complaint, Textron is and was a "powersports vehicle manufacturer" pursuant to Colo. Rev. Stat. Ann. § 44-20-402(14) and its predecessor, § 12-6-502(13).

10. Defendant Joel Ranum is upon information and belief a resident of the State of Colorado. Ranum was at all times relevant to this Complaint an employee of Defendant Textron and operated under the title of "Textron District Sales Manager for Colorado, New Mexico, Western Nebraska, and El Paso, Texas," which includes the territory in which Plaintiffs operated. The last known address for Ranum is 309 Vindicator Drive, Cripple Creek, Colorado 808130.

## JURSIDICTION, CHOICE OF LAW, AND VENUE

11. The Court has specific jurisdiction over Textron because this case arises from certain of Textron's transactions, contracts, and tortious conduct within the State of Colorado. Additionally, Textron avails itself of business opportunities in Colorado, employs regional sales

[1] Effective October 1, 2018, the codification of the Colorado statutes dealing with Powersports Vehicles was changed. *See* 2018 Colo. Legis. Serv. Ch. 7 (S.B. 18-030). The language for all parts relevant to this Complaint remained the same, however. This Complaint shall use the current codification after the introductory paragraphs.

representatives who operate in and around Colorado (including Defendant Ranum), distributes its products within the State of Colorado, and has a registered agent at 7700 E. Arapahoe Road, Suite 220, in Centennial, Colorado 80112-1268.

12. Venue is proper in this this Court under Colo. Rev. Stat. Ann § 44-20-433 and its predecessor, § 12-6-531, because:

(a) Plaintiffs first sustained injury by the wrongful acts or negligent conduct alleged in the action in Douglas County, Colorado;

(b) The District of Douglas County, Colorado is the judicial district wherein Plaintiffs had their principle place of business;

(c) Plaintiff Parker Powersports is a "powersports vehicle dealer" pursuant to Colo. Rev. Stat. Ann. § 44-20-402(12) and its predecessor;

(d) Textron is a "powersports vehicle manufacturer" pursuant to Colo. Rev. Stat. Ann. § 44-20-423(14) and its predecessor;

(e) Plaintiffs' claims arise out of a dispute under the franchise agreement with Textron; and

(f) Colo. Rev. Stat. Ann § 44-20-433 and its predecessor invalidates any choice of law or choice of venue provisions in the contract at issue in this Complaint.

13. The claims raised in this Complaint are raised under Colorado law, which is proper according to Colo. Rev. Stat. Ann § 44-20-433 and its predecessor and the same conditions present in the preceding paragraph.

## ALLEGATIONS COMMON TO ALL COUNTS

### *A. The History of Arctic Cat and Textron*

14. Arctic Cat is a is a brand of powersports vehicles manufactured in Thief River Falls, Minnesota.

15. Arctic Cat was founded by snowmobile pioneer Edgar Hetteen in 1960. Over the years, Arctic Cat grew to become one of the most widely recognized and known manufacturers in the snowmobile industry.

16. In 1996, Arctic Cat also began to manufacture all-terrain "ATV" vehicles and, in 2005, began to manufacture "side by side" "UTV" vehicles.

17. Arctic Cat, however, had a long history of financial instability. It declared bankruptcy in 1982. In 1984, a new company named Arctco was created to continue the production of Arctic Cat snowmobiles. That effort was successful, and in 1996 the company changed its name back to Arctic Cat. Nonetheless, Arctic Cat continued to experience periods of uncertainty.

18. In late 2014, Christopher Metz became Arctic Cat's president and CEO. Arctic Cat began to counter years of management turbulence and poor financial performance by focusing aggressively on reducing dealer inventory, boosting promotions, increasing new products and sponsoring more events in the sports racing world.[2]

19. Metz' plan to revitalize Arctic Cat experienced some success and made Arctic Cat attractive to outside buyers, including Textron.

[2] See *Longtime Minnesota snowmobile maker Arctic Cat sold for $247 million*, Paul Walsh and Dee DePas, Minneapolis Star Tribune, January 25, 2017 (https://www.startribune.com/longtime-minnesota-snowmobile-maker-arctic-cat-sold-for-247m/411748026/).

20. Textron Inc. is a Rhode Island-based conglomerate whose products include Bell helicopters, Cessna and Beechcraft airplanes, Jacobsen lawnmowers, and Cushman Golf Carts. Textron Specialized Vehicles (referred to in this Complaint as simply "Textron") is a business subsidiary of Textron Inc.

21. On January 25, 2017, it was announced that Arctic Cat would be acquired by Textron for $247 million in a cash transaction.[3]

22. A statement released by Metz proclaimed that "[t]his transaction presents increased opportunities for the business to leverage our combined scale, accelerate growth and enhance product innovation in ways that will benefit our customers, dealers and employees." Metz added:

> "We are proud of the progress our team has made to lay the foundation for Textron to continue taking this company forward. Textron plans to build on Arctic Cat's strong brand and history of innovation. We expect many Arctic Cat employees to benefit from expanded career opportunities as part of a larger, more diversified company. On behalf of the Arctic Cat board and management team, we thank our dedicated employees for their hard work, commitment and pride in making Arctic Cat an enduring competitor and beloved brand in the powersports market. We are excited about Arctic Cat's future."[4]

23. Arctic Cat's press release announcing Textron's acquisition claimed that the combination of Arctic Cat and Textron "will be well positioned to be a powersports industry leader with a wider product line-up, and allow for more aggressive investment in product development, dealer networks, marketing and customer service."[5]

---

[3] *Id.*

[4] *Arctic Cat to Be Acquired by Textron in $247 Million Cash Transaction*, Press Release, Arctic Insider, January 25, 2017 (http://www.arcticinsider.com/Article/Arctic-Cat-to-Be-Acquired-by-Textron-in-247-Million-Cash-Transaction).

[5] *Id.*

24. Textron began sending the message to existing and prospective powersports vehicle dealers, including Plaintiffs, that it was looking to foster an atmosphere conducive to a partnership between it and its dealers, and that it was looking to build a business together with its dealers.

25. One of the messages Textron was sending to its existing and prospective powersports vehicle dealers, including Plaintiffs, was that it was investing heavily into the marketing of the Arctic Cat line of vehicles.

26. Some of the marketing promises Textron made to its existing and prospective powersports vehicle dealers, including Plaintiffs, were:

(a) that Textron would aggressively market and support its dealers;

(b) that Textron would supply dealers with money towards purchasing signage;

(c) that Textron was offering the end-consumer enticing incentives such as great financing terms (between 0 and 3%) and rebates; and

(d) that Textron was making sure its dealers had great product availability.

27. Textron was also making big promises that it would support the business operations of its existing and prospective powersports vehicle dealers.

28. For example, Textron had dealer-support programs that helped its dealers inventory product. Textron had an agreement with Wells Fargo whereby a dealer could buy and hold Arctic Cat products on its floor for 180 days interest-free. This allowed dealerships to inventory Arctic Cat powersports vehicles on their floor without having to pay interest charges so long as the product was purchased by an end-consumer within that 180-day period.

29. As Textron's powersports vehicle dealers would eventually learn, however, Textron's promises were only good so long as its leadership thought they could be exploited for profit.

30. On October 12, 2018, Scott Ernest was named the president and CEO of Textron. Commenting on the leadership transition, Textron Inc. chairman and CEO Scott Donnelley stated:

> "Scott Ernest begins his leadership of Textron Specialized Vehicles at a time when his experience will be especially valuable," added Donnelly. "The business continues to expand its product line and build out its dealer network, which is vital for our plans to grow sales in the US and internationally. Scott brings an extensive track record of success in taking businesses to the next level—something he did very well at Textron Aviation, and I'm confident he will do at Textron Specialized Vehicles."[6]

31. Ernest's installment as CEO of Textron began a period of significant reorganization within Textron, including redrawing sales territories, forging partnerships with big chain stores, and financially devastating the dealer network Textron had previously been so vocal about supporting.

***B. Textron forms a "game changing" partnership with Bass Pro Shop's Tracker.***

32. On January 17, 2019, Textron announced what it called a "game changing" partnership with the brand Tracker to introduce a new "Tracker Off Road" line of ATV and side-by-side vehicles.

---

[6] *Textron Announces Scott Ernest as President and CEO of Textron's Industrial Segment and Textron Specialized Vehicles Inc., and the Promotion of Ronald Draper as President and CEO of Textron Aviation*, Textron Press Release, October 12, 2018 (https://investor.textron.com/news/news-releases/press-release-details/2018/Textron-Announces-Scott-Ernest-as-President-and-CEO-of-Textrons-Industrial-Segment-and-Textron-Specialized-Vehicles-Inc-and-the-Promotion-of-Ronald-Draper-as-President-and-CEO-of-Textron-Aviation/default.aspx).

33. Tracker is essentially a "house brand" of national outdoor retail chain Bass Pro Shops. Tracker Off-Road vehicles are "sold through the world's leading independent boat dealer network of select Ranger, Triton, and Tracker, and other independent dealers, as well as Bass Pro Shops and Cabela's locations, which host more than 200 million outdoor lovers annually."[7]

34. A Textron press release touting the new partnership with Tracker stated that:

> The new models will be designed in partnership with [Textron], known worldwide for its brands and products that serve numerous industries. [Textron] product lines include Arctic Cat snowmobiles, side-by-sides and ATVs; Cushman utility vehicles, E-Z-GO golf cars, Jacobsen professional turf care equipment, and Textron GSE ground support equipment. [Textron] will manufacture TRACKER OFF ROAD vehicles at its facility in Thief River Falls, Minn.[8]

35. The same press release stated that:

> Tracker Off Road customers will be able to rely on the brand's renowned customer friendly shopping process, extensive network of authorized service centers for all their vehicular needs, from the purchase and installation of Tracker Off Road accessories to maintenance, service and support for their vehicles.[9]

36. Describing the new partnership, then-new Textron CEO Ernest stated:

> We are thrilled to partner with [Bass Pro Shops founder and CEO] Johnny Morris and TRACKER to launch this amazing new line of products. The TRACKER brand is renowned and respected by lovers of the outdoors all over the world, and we are proud to design and manufacture this new line of side-by-sides and ATVs that will extend its reach and reputation into the off-road industry. These rugged, reliable and versatile vehicles are worthy of the TRACKER brand and wear it

---

[7] *Textron and Tracker Announce Game-Changing Made in the USA Partnership in the ATV Industry*, Textron Press Release, January 22, 2019 (https://investor.textron.com/news/news-releases/press-release-details/2019/Textron-and-TRACKER-Announce-Game-Changing-Made-in-the-USA-Partnership-in-the-ATV-Industry/default.aspx).

[8] *Id.*

[9] *Id.*

with pride.[10]

37. In an interview discussing the partnership with Tracker, Ben White, the marketing sponsorship manager for Textron, stated that "[t]he announcement allows us to get more vehicles through to the Bass Pro and Tracker Markets. Tracker has a reputation for reliability and prowess and our American heritage is in our roots."[11]

38. Textron extravagantly promoted its partnership with Tracker and the new line of Tracker Off-Road powersports vehicles.

39. The January 17, 2019, event launching the "powerhouse" partnership with Tracker and the new Tracker Off-Road vehicles featured appearances, in Textron's own words, of "high-profile celebrities and sportsmen including NFL Super Bowl Champion Peyton Manning, country music star Luke Bryan, Professional Bull Riding legend 'Cool Hand' Luke Snyder and fishing legend Jimmy Houston."[12]

40. The event was broadcast live to all Bass Pro and Cabela's stores and more than 600 independent dealers worldwide.

41. Also at the event, NASCAR champion Martin Truex, Jr., made a special appearance to unveil the new paint scheme for his vehicle that would be racing in the 2019 NASCAR season. "Tracker ATVs" is prominently displayed on the car:

---

[10] *Id.*

[11] *Why the Arctic Brand is Returning to Off-Road Vehicles*, Lynn Marcinkowski Woolf, Rural Lifestyle Dealer, February 12, 2019 (https://www.rurallifestyledealer.com/articles/8040-why-the-arctic-brand-is-returning-to-off-road-vehicles).

[12] *Textron and Tracker Announce Game-Changing Made in the USA Partnership in the ATV Industry*, Textron Press Release, January 22, 2019 (https://investor.textron.com/news/news-releases/press-release-details/2019/Textron-and-TRACKER-Announce-Game-Changing-Made-in-the-USA-Partnership-in-the-ATV-Industry/default.aspx).




42. Starting in May 2019, Tracker Off-Road vehicles started rolling out to all Bass Pro Shops, Cabela's, and the over 600 independent Tracker dealers world wide.

***C. The line of powersports vehicles offered by Arctic Cat, "Textron Off-Road," "Tracker Off-Road," and the blurry lines that separate them.***

43. By 2017, Arctic Cat's most popular ATV model was the Alterra. The Alterra was billed as a "premium" ATV with "unmatched power."

44. By 2017, Arctic Cat's most popular UTV "side by side" models were the Prowler, a utility model with a large rear mounted box similar to a pickup truck bed, and the Wildcat, a model created to meet the demand for recreational, high speed trail UTVs. Both Prowlers and Wildcats were offered in 2 and 4 seat models with various engine offerings.

45. After Textron's January 2017 acquisition of Arctic Cat, the all-terrain and side by side vehicles manufactured by Arctic Cat were rebranded as "Textron Off-Road," whereas the snowmobile models kept the "Arctic Cat" brand.

46. Consumers, however, were not as receptive to the name change as Textron had hoped and the change was thus short-lived.

47. In January 2019, less than 2 years after changing the name of the off-road vehicles from "Arctic Cat" to "Textron Off-Road," Textron announced it was changing the name of the Textron Off-Road vehicles back to "Arctic Cat" starting in the 2020 model year.

48. As if that confusion were not enough, at the same time it announced the "Arctic Cat" name change, Textron announced its new partnership with Tracker.

49. As noted above, Textron claimed the Tracker Off-Road powersports vehicles were "new models" that would be "designed in partnership" with Tracker.

50. Contrary to Textron's claims, however, the new Tracker Off-Road powersports ATV and UTV vehicles were not "new models" "designed in partnership with" Tracker; the Tracker Off-Road powersports vehicles were essentially carbon copies of their Textron Off-Road equivalents, with just a different name slapped on the side.

51. For example, in a June 7, 2018, press release, Textron described the new 2019 Textron Off-Road "Prowler Pro" UTV as having the following features:

(a) A 50-horsepower, "whisper-quiet," 812cc EFI engine;
(b) 10 inches of front and 9.5 inches of rear suspension travel;
(c) 10.75 inches of ground clearance;
(d) 26-inch Pro Terrain tires;
(e) 2,000-pound towing capacity;
(f) 1,500-pound payload capacity;
(g) 1,000-pound cargo box capacity;
(h) 17.92 cubic-feet of overall storage capacity, including 14.69 cubic-feet of capacity in the cargo box; and
(i) "a three-person bench seat perfect for work applications, and tilt steering with a column shifter for easy and comfortable operation."[13]

52. Meanwhile, the Tracker Off Road "800SX" boasts the following features:

(a) 50 horsepower 812cc EFI engine with "best in class sound at idle;"
(b) 10 inches front suspension travel, 9.5" rear suspension travel;
(c) 10.75 inches ground clearance;
(d) 2,000 pound towing capacity;
(e) 1,500 pound payload capacity;
(f) 1,000 pound cargo box capacity; and three-passenger bench seating with removable seats and behind-seat storage in 2nd row, and a tilt-steering wheel with column shifter.

[13] *Introducing the New Textron Off Road Prowler™ Pro*, Press Release, June 7, 2018 (https://investor.textron.com/news/news-releases/press-release-details/2018/Introducing-the-New-Textron-Off-Road-Prowler-Pro/default.aspx).

53. Visually, the vehicles appear identical, with the exception of the logo and the color:

(a) 2019 Textron Prowler Pro:



(b) The Tracker 800SX:



54. The vehicles also share the exact same overall length (126 inches), overall width (63 inches), overall height (74 inches), overall weight (1,585 pounds), wheelbase (85 inches), seat height (32 inches), fuel capacity (10 gallons), and bed dimensions (40.5 x 54 x 11.5 inches).

55. Just as the 800SX is the exact same vehicle as the Prowler Pro, the remaining Tracker UTVs are the same as their Textron/Arctic Cat equivalents. The Tracker XTR1000 UTV is the same as the Textron Wildcat XX, the Tracker SVX1000 UTV is the same as the Textron Havoc, and so on.

56. The similarities between the Tracker and Textron ATVs are likewise uncanny. The Tracker 90 is the same as the Alterra 90, the Tracker 300 is the same as the Alterra 300, the Tracker 570 is the same as the Alterra 570, and the Tracker 700EPS is the same as the Alterra 700.

57. In fact, other than the logo on the side, the only other material difference between a Tracker vehicle and a Textron Off Road vehicle was the price: a Tracker Off Road model sells for considerably less money than its Textron/Arctic Cat Off Road equivalent.[14]

58. Industry publications took note: save a lot of money and get the exact same thing by buying a Tracker instead of an Arctic Cat.

59. *UTV Action Magazine*, in an article titled "Arctic Cat Models Also Sold as Tracker at Bass Pro," pointed out that:

> The Wildcat XX as you know it is now called the Tracker XTR1000," and "[i]t and all other ATV's and [side by sides] produced by Textron or Arctic Cat will be sold under the Tracker name at Bass Pro Shops and Cabela's stores throughout

---

[14] *Id.*

> the country.... The Tracker XTR1000 is listed at $17,999, which is $2,500 less than what it was being sold for at [Arctic Cat.][15]

60. In a separate article, the same publication stated that "Tracker UTVs will be available at Bass Pro Shops stores all over the country, and the 2020 lineup includes many models that are *identical* to 2019 Arctic Cats, *except for big price reductions on most models.*" (Emphasis added.)[16]

61. *Dirt Wheels Magazine* stated that, while Tracker Off-Road does not have an equivalent to every Arctic Cat off-road vehicle, it does "have a smart selection that most outdoorsmen would like" that will "sell for considerably less than the Arctic Cat model."[17]

62. *ATV.com* stated "[t]he partnership with Textron means Tracker Off Road has years of off-road experience at its fingertips. In fact, the Tracker ATVs are essentially re-branded Arctic Cat Alterra ATVs."[18]

63. Consumers, obviously, were quick to catch on as well: save a lot of money and get the same thing by buying a Tracker Off-Road product instead of an Arctic Cat.

---

[15] *Arctic Cat Models Also Sold as Tracker at Bass Pro*, UTV Action Magazine, May 1, 2019 (https://utvactionmag.com/arctic-cat-models-also-sold-as-tracker-at-bass-pro/).

[16] *2020 Tracker Off Road Lineup*, ATV UTV Action, August 2019 (https://utvactionmag.com/first-look-2020-tracker-off-road-lineup/).

[17] *Tracker Off-Road ATVs and UTVs*, Dirt Wheels Magazine, August 16, 2019 (https://dirtwheelsmag.com/wide-open-21/).

[18] *Tracker ATV Lineup: History, Features and More*, ATV.com, December 20, 2019 (https://www.atv.com/manufacturer/tracker-off-road/tracker-atv-lineup-history-features-and-more).

64. For example, posts on consumer forums such as "race-dezert.com" state that, if you are looking at buying an Arctic Cat XX, the Tracker Off-Road equivalent is "basically rebadged Arctic Cats" selling for significantly less money. "Same machine!"[19]

### *D. Textron's Promotion of the Tracker Off-Road brand came at the expense of Arctic Cat Off-Road.*

65. Other than the price, another significant difference between Arctic Cat Off-Road and Tracker Off-Road was the amount of support Textron put behind each.

66. Textron's advertisements and promotion of the Arctic Cat Off-Road brand immediately took a backseat to Tracker Off-Road.

67. Textron dropped many of its marketing programs for the Arctic Cat product. The interest rates it afforded the end-consumers purchasing through Arctic Cat dealers, once 0 to 3%, went up to 6.9%. The rebates that once enticed consumers vanished completely.

68. Textron's support of the Arctic Cat dealers likewise took a turn for the worse. The 180-day interest-free flooring terms became only 60 days, then vanished completely. Arctic Cat dealers were then forced to pay 16% interest—yes, *sixteen percent*—on all financed Arctic Cat product they had sitting on their dealership floors.

69. That is if an Arctic Cat dealer could even get product to sell. As Textron became more heavily focused on producing products for the Tracker Off-Road brand, its production of the Arctic Cat Off-Road version suffered. The top-selling Arctic Cat models became backordered and unavailable to dealers—regardless of consumer demand—as Textron was instead more focused on supplying the Tracker outlets with product.

[19] March 8, 2019, post in "Looking for advice before buying a new SxS" topic on Off-Road Racing Community, UTV" subforum. Race-dezert.com. (https://www.race-dezert.com/forum/threads/looking-for-advice-before-buying-a-new-sxs.131694/page-3#post-1857574).

70. This sudden sea change in Textron's strategy clearly swept the legs out of Arctic Cat Off Road powersports dealerships, such as Plaintiffs.

***D. Textron authored a purported "Dealer Agreement" that clearly favors Textron and disfavors the powersports vehicle dealership.***

71. To become a Textron-affiliated powersports vehicle dealership, a prospective dealer must sign a Textron-authored document titled as the "Textron Specialized Vehicles U.S. Dealer Agreement" (the "Purported Agreement" or "P.A."). A copy of the Purported Agreement entered into by Textron with Plaintiffs Parker Powersports and Allen is attached as Exhibit A.

72. The Purported Agreement claims to bind the subject powersports vehicle dealer to certain terms in order to become an authorized dealership of Textron product lines.

73. Textron, however, authored these terms to disproportionately favor Textron and disfavor the powersports vehicle dealer.

74. For example, while the powersports vehicle dealer is assigned a "Primary Area of Responsibility" ("PAR"), Textron states that the PAR is non-exclusive, the powersports vehicle dealer has no actual implied right to be the only company dealer within the assigned PAR, Textron can alter the PAR as it sees fit, and that Textron can place new dealers within the PAR at its sole discretion and without the dealer's consent. (Purported Agreement, §§ 1.g, h; 2.a; 19.a.) The Purported Agreement even states that Textron itself reserves the right to sell its products to end users within the dealer's assigned PAR, with "end users" being defined as "retail chains stores, governmental agencies, institutions or entities," etc. (P.A., § 3.e.)

75. The powersports vehicle dealer is also required to "[m]aintain a minimum model representation which shall at no time be less than the number of units reasonably established by [Textron], subject to availability." (P.A., § 3.j.) Elsewhere, the Purported Agreement states:

> Dealer agrees to order, stock, maintain, protect from the weather and prominently display in new salable condition at each DEALER LOCATION representative models of each type of PRODUCT, which Dealer is authorized to sell hereunder. It shall be Company's sole right to determine minimum PRODUCT LINE stocking requirements.

(P.A., § 6.)

76. Although title to each product purchased by the dealer passes to the dealer once the dealer's payment is received, Textron is not liable for any delay in the dealer receiving the product. (P.A., §§ 7.b; 9.b, d.) Further, "[a]ll sales of PRODUCTS to Dealer are final, and Dealer shall accept all PRODUCTS ordered by it." (P.A. § 7.d.)

77. Regarding the dealership facilities, the dealer is required to establish and maintain at a location approved by Textron a place of business that, in Textron's opinion, is of satisfactory size and layout, contains adequate space, and is equipped in Textron's sole satisfaction to enable the dealer to meet its obligations. (P.A., § 13.a.)

78. Regarding the product itself, Textron reserved the right to alter, modify, or discontinue a product design, or discontinue availability in the PAR of a certain product or product derivative. (P.A., § 20.)

79. With regards to termination of the Purported Agreement, the Purported Agreement itself only provides illustrations, but not limitations, as to how the termination should be conducted. (P.A., § 23.)

80. Textron, however, felt it had the right, but not the obligation, to repurchase any of the new product that the dealer had purchased from Textron (but had not yet sold). (P.A., § 25.)

81. Lastly, the Purported Agreement purports to restrict the powersports vehicle dealer to bring actions against Textron only in the State of Georgia, and only under Georgia law. (P.A., § 36.)

***E. Arctic Cat Off-Road Pricing***

82. Textron also set the pricing for the Arctic Cat Off-Road product line. This included both what Textron charged the dealership for the vehicle and what the dealership could advertise the vehicle for with respect to price to the public.

83. The Arctic Cat Off-Road powersports vehicle dealer would pay Textron an amount called the "Dealer Net" for each powersports vehicle the dealer stocked and/or sold. The dealer would also pay a specific freight charge to have the vehicle delivered to the dealership.

84. Textron set a Manufacturer's Suggested Retail Price ("MSRP") for each Arctic Cat Off-Road powersports vehicle. The MSRP was an amount slightly more than the Dealer Net, with the difference being the amount a dealer would make on each sale of an Arctic Cat Off-Road vehicle. The dealer could also forward its freight cost on to the consumer.

85. Textron also set a Minimum Authorized Pricing ("MAP") for each Arctic Cat Off-Road powersports vehicle. For lower-priced vehicles, the MAP was the same as the MSRP. For some higher-priced vehicles, the MAP was less than the MSRP but still greater than the Dealer Net.

86. While Textron required its dealers to aggressively promote Arctic Cat Off-Road vehicles, Textron also required that its dealers advertise Arctic Cat powersports vehicles at no less than the MAP set by Textron.

87. If an Arctic Cat Off-Road dealership were caught by Textron advertising Arctic Car product at a price lower than the MAP, the dealer's Arctic Cat license could be put in jeopardy.

88. Thus, Tracker Off-Road outlets such as Bass Pro were advertising Tracker Off-Road products for far less than the MAP that Arctic Cat dealers could advertise the Arctic Cat equivalent. In fact, Bass Pro was advertising the Tracker Off-Road products for less than Arctic Cat dealers could even buy the Arctic Cat equivalent.

89. Between the price of the competing products and the promotional disparity, Arctic Cat dealers were placed in untenable positions they could not work themselves out of.

***F. Plaintiffs Parker Powersports and John Allen***

90. In February 2017, Colorado resident John Allen began the process of opening a powersports vehicle dealership in the Parker, Colorado area. That dealership would become Parker Powersports. Allen had lived in the Parker and Aurora, Colorado area since 2006 and had amassed extensive experience in the realm of business management.

91. Allen met with representatives of Arctic Cat to discuss the possibilities of becoming an Arctic Cat dealer. It was during Allen's initial period of interest that Textron purchased Arctic Cat.

92. Textron represented to Allen that it was looking to grow the Arctic Cat brand and product offerings and invest heavily in marketing and dealer support, as detailed above.

93. In fact, Defendant Joel Ranum, the Textron District Sales Manager for Colorado, New Mexico, Western Nebraska, and El Paso, Texas, at one point told both Allen and Textron that he believed Parker Powersports had the potential to become the largest Arctic Cat retailer in Colorado.

94. Based on these representations, Allen formed Parker Powersports as a corporation on March 2, 2017, signed a 7-year lease on a building located at 15690 Parkerhouse Road in Parker, Colorado, and began to invest heavily in the dealership, drawing from his 401k,

spending all of his savings, getting a second mortgage on his home, and taking a loan out on the estate of his grandmother.

95. Parker Powersports was officially open for business on July 1, 2017, and received its Powersports Dealership Franchise license from the State of Colorado effective August 1, 2017.

96. In June 2017, Parker Powersports officially became an Arctic Cat and Textron Off-Road dealer.

97. Over the next few years, Parker Powersports grew to sell and service ATVs, snowmobiles, UTVs, motorcycles, and lawn and garden equipment.

98. Parker Powersports' main product offerings, however, were Arctic Cat and Textron Off-Road powersports vehicles. Parker Powersports' viability and financial success hinged on its sales of the Arctic Cat and Textron Off-Road product lines.

99. Textron and Arctic Cat's status as Parker Powersports' main product offerings came about by Textron's encouragement and by virtue of the Purported Agreement Parker Powersports signed with Textron.

100. Based on Textron's representations, Allen continued to invest in the Parker Powersports dealership and Defendant's product.

101. On September 14, 2018, Allen, on behalf of Parker Powersports, signed a new copy of the Purported Agreement.

102. That Purported Agreement, as discussed above, required Parker Powersports to have a certain number of new Arctic Cat and/or Textron Off-Road vehicles in stock and on display in the dealership.

103. Initially, Plaintiffs believed Textron was going to follow through on its promises.

104. At the start of 2019, however, it became apparent that Textron had no intention of following through on its promises.

105. When Textron Off-Road rebranded back to "Arctic Cat" and Textron began its partnership with Tracker, it stopped or delayed a majority of the 2020 Arctic Cat vehicles meant for Arctic Cat powersports dealerships.

106. It later became apparent that Textron had focused its production on the new Tracker Off-Road equivalents of the Arctic Cat products at the expense of producing product for its Arctic Cat dealers.

107. This delay left Parker Powersports with limited new vehicle availability. Even if a potential customer was willing to pay the premium for an Arctic Cat vehicle over its Tracker Off-Road equivalent (and there was no reason for an informed consumer to do so), Parker Powersports had difficulty obtaining one to sell.

108. Instead, Textron tried to push older, unsold models to its powersports vehicle dealers, including Plaintiff.

109. Additionally, the margins eroded on the vehicles while the financing rates increased. The rebates vanished, and the marketing support that once helped Parker Powersports attract and sell powersports vehicles to consumers dwindled down to next-to-nothing.

110. On January 14, 2019, a few months after Ernest was named the CEO of Textron, Defendant Joel Ranum, the Textron District Sales Manager for Colorado, New Mexico, Western Nebraska, and El Paso, Texas, emailed Allen and the other dealerships within his territories.

111. Ranum's email began by stating:

> Many of you have already heard there has been a significant reorganization within the company and many folks were let go last week. There will be people picking up the responsibilities of those departing so we'll all need to get acquainted with some new folks.

112. Ranum's email then explained how Ranum's territories and the details of what products he serviced were changing and that Ranum would now just be focusing on the "Arctic Cat Snow and Dirt products." The email then listed the new sales reps for individual product lines that would be taking over Ranum's territory.

113. The email concluded by stating:

> I'm sure this will seem confusing for some of you for a while.... Scott Ernest and the executive team are committed to making this a profitable business for both of us. There will be bumpy times ahead and many bugs to work out, but with your patience and assistance, we'll all get through it.... Focus on retail and getting your inventory down. It's the best thing you can do right now.

114. Around this same time, the new line of Tracker Off Road powersports vehicles were officially announced.

115. The Tracker Off-Road products featured retail pricing that was lower than the amount for which Parker Powersports could even buy the Arctic Cat equivalent, and thus much less than Parker Powersports could sell the Arctic Cat equivalent to a consumer, after adding its reasonable dealer markup.

116. When Allen would try to sell an Arctic Cat vehicle to potential customers, he knew the customers were aware that Tracker offered the exact same product at a much cheaper price.

117. Further, even if Parker Powersports were to try to cut its own markup in order to attract customers, Textron's Purported Agreement prohibited dealerships such as Parker Powersports from advertising an Arctic Cat powersports vehicle for less than the MAP.

118. Parker Powersports' 2019 sales of Arctic Cat products fell to $617,634, accounting for only 43% of its revenue. The gross profit margin in Arctic Cat vehicles dropped to 9.9%, and Parker Powersports accrued $10,082 in "flooring interest" charges due to worse flooring terms and vehicles that were sitting on his showroom floor and not selling due to the Tracker competition.

119. Parker Powersports, in an attempt to offset the decline of its Arctic Cat line, picked up an additional powersports brand, Kymco, and increased their lawn and garden business.

120. Allen wrote Ranum in an August 2, 2019, email (Attached as Exhibit B):

> The current atmosphere Textron has created is making it very difficult to operate profitably.... The vehicle margins, ordering structure, marketing efforts, and consumer confidence for AC/Textron vehicles have all deteriorated considerably. I have continued to work with Textron just hoping that more rational minds will prevail before we are forced to part ways.

121. Ranum replied to Allen in an August 5, 2019, email:

> My frustration is that I have many dealers who would be grateful to be afforded your status and opportunity. I stuck my neck out and told management you had the potential [to] become the largest retailer in Colorado. They agreed to proceed with your dealership. *Your retail decline with AC is of great concern. It tells me you are, at least in part, replacing AC sales with your other brand. This is a poor recipe for prolonged success with us. Our ask is simple: maintain the inventory to match last year's 90 day retail period; and then retail it....*
>
> *I've explained in detail how we will be operating going forward. We still have non-current product to sell through to be able to operate as we desire. This will take many months and we request and expect our remaining business partners will participate in clearing it, which is to everyone's benefit.*
>
> You mention competition with Tracker Pricing. I don't have hard data, but I suspect if Tracker sells one unit in your area, Polaris sells a Thousand. Focus you[r] energy to compete with them[,] CanAm and Honda. That's where you'll gain sales.

(Emphasis added.)

122. Ranum's email also informed Allen that Parker Powersports' most recent orders were not compliant with Textron's required minimums, implying that Parker Powersports would need to order more powersports vehicles in order to maintain the business relationship with Textron.

123. Allen replied to Ranum in an August 5, 2019, email:

> Yes my retail decline with Arctic Cat/Textron is of great concern to me as well. Yes some of this can be attributed to replacing floorspace with Kymco buy some of that blame is Textron forced that move with limited vehicle availability, poor consumer financing, poor communication, poor flooring terms, and poor business decisions that have led to a decline in customers wanting [Arctic Cat.]
>
> I have sold over a dozen VLX, I sold 22 Alterra 500s/450s. You no longer supply these vehicles or anything comp. So I went to the source that could. In the last year we went from 180 day flooring minimum in most cases to 60 days for new products. Hell, it usually takes 2-3 weeks to receive the product that is billed to me. Sure I compete against Polaris, CanAm, and Honda, but we have DIFFERENT vehicles! You can't keep downplaying the fact that Tracker Offroad are the SAME vehicles. Consumers know and are comparing....
>
> We have already been thru this argument and hashing out over this VSM compliance is pointless. I'm not ordering 2 year old models at 2 year old pricing to be VSM compliant. You are comparing retail sales in a reality that doesn't exist anymore and everything has changed. I will be ordering and retailing less vehicles going forward for all the factors listed above. It's insane to think it would stay the same! ....
>
> Unless Textron changes their programs I don't see a business relationship lasting either. Frankly you are so out left field on what you think I should accept and be grateful that I'm scared to do any business with you. I'm stuck between a rock and a hard place.

124. Ranum replied to Allen in an August 7, 2019, email:

> I will not tell you what to do. I will be straight forward and tell you how it is even if unappealing to you. I'm unable to write you a special program with the terms you want....
>
> Is it possible you don't understand the giant investment we've made as your business partner to work this inventory down and set up a go forward operation that is much better for all involved. Even if you don't have an inventory problem

> do you understand how the continued reduction in inventory is and will continue to improve our products value in the market place. Simple supply and demand.
>
> I'll end as I began. I don't tell you what to do. I recommend what you should do as our business partner and yes, I defend our go forward plans.

125. Allen responded:

> [M]y operation is not to sell on price, but to sell on profit. AC vehicles are the lowest profit margin transactions on my floor and has decreased in the last 8 months. And I don't think you are offering me programs that are going to improve margins. 2020 pricing has significantly squeezed margins while increasing interest risk and offering less models.
>
> You can paint the picture however you like but at the end of the day I'm making decisions for my business to keep the doors open. If I didn't diversify and bring in other brands and product types I would have already closed up. When it comes to investment, I assure you, I have done as much as anybody proportionately. We close up, I lose my house.

126. Throughout the Fall of 2019, Tracker continued to erode Parker Powersports' sales.

127. Allen's frustration with Textron continued.

128. On October 8, 2019, Ranum emailed Allen to inquire whether he wished to be VSM compliant, "or if your plan is to sell down to exit."

129. Allen replied to Ranum's email, stating he did not wish to be VSM compliant as "it doesn't make any sense." Allen further stated that Ranum "strongly suggested I come up with an exit strategy if I didn't become compliant but I did not think VSM compliance was a requirement?"

130. As the weeks went on, the financial straits Parker Powersports was placed into by Textron's actions became untenable. By January 2020, Allen saw no other option but to close the business.

131. Allen, in a letter to Textron officially informing them of his plans to close Parker Powersports within the next 60 days, informed Textron that the closure was primarily due to the decline of Arctic Cat and the Textron decisions regarding the brand.

132. Following Allen's letter, Allen and Ranum engaged in a series of emails wherein Allen informed Ranum he still had 4 new and unmodified Arctic Cat vehicles on hand and that no other Colorado dealer was willing to take them.

133. On February 27, 2020, Ranum emailed Allen to inform him that Textron would not be taking back the new and unmodified vehicles.

134. Allen eventually had to take a substantial loss on the vehicles in order to sell them prior to losing the Parker Powersports building.

## PLAINTIFFS' CAUSES OF ACTION

### COUNT I

### Declaratory Judgment that the Choice of Law and Venue Provisions of the Purported Agreement are Invalidated by Colorado Statute

135. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

136. Plaintiff Parker Powersports entered into the Purported Agreement with Defendant Textron.

137. The Purported Agreement purports to restrict Plaintiff Parker Powersports to bring legal action against Defendant Textron only in the State of Georgia, and only under Georgia law. (P.A. § 36.)

138. Plaintiff Parker Powersports is a "powersports vehicle dealer" pursuant to Colo. Rev. Stat. Ann. § 44-20-402(12) and its predecessor.

139. Defendant Textron is a "powersports vehicle manufacturer" pursuant to Colo. Rev. Stat. Ann. § 44-20-423(14) and its prececessor.

140. Colo. Rev. Stat. Ann. § 44-20-433(a) provides that "[i]n the event of a dispute between a powersports vehicle dealer and a powersports vehicle manufacturer under a franchise agreement, notwithstanding any provision of the agreement to the contrary[,]" the venue shall be "[a]t the option of the powersports vehicle dealer, ... in the county or judicial district where the dealer resides or has its principal place of business."

141. Colo. Rev. Stat. Ann. § 44-20-433(b) additionally provides that "Colorado law shall govern, both substantively and procedurally."

142. Colo. Rev. Stat. Ann. § 44-20-433, and its predecessors, have been in effect during all times relative to the claims pleaded in this Complaint, and during all times relevant to the Purported Agreement entered into by Plaintiffs and Defendant.

143. Plaintiffs therefore request that this Court make a declaratory judgment that both the venue and choice of law provisions in the Purported Agreement authored by Textron are invalid pursuant to Colo. Rev. Stat. Ann. § 44-20-433 and are thus not controlling over Plaintiffs' claims.

**COUNT II**

**Fraudulent Inducement**

144. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

145. Defendants communicated representations to Plaintiffs to convince Plaintiffs to enter into its Purported Agreement.

146. Defendants' communications included misrepresentations of material fact, including:

(a) That Textron was looking to foster an atmosphere conducive to a long-term partnership between it and Plaintiffs;

(b) That Textron was looking to build a business together with Plaintiffs;

(c) That Textron was heavily investing in, and would continue to heavily invest in, the Arctic Cat Off Road line of powersports vehicles and the Arctic Cat Off Road powersports vehicle dealers;

(d) That Textron would aggressively market and support its network of Arctic Cat powersports vehicle dealers, including Plaintiff;

(e) That Textron was making sure, and would continue to make sure, its dealers would have great product availability;

(f) That Textron would ensure all its dealers would operate on a fair and even playing field, and that it would not give preferential treatment or pricing to one dealer over another;

(g) That Textron would not produce its product under the false guise of a different "line make" in order to circumvent its obligations pursuant to the Purported Agreement; and

(h) That the Tracker Off Road powersports vehicles were a different line-make, when, in fact, they were identical to the Arctic Cat Off Road vehicles and were, for all intents and purposes, the same.

147. These facts were material to Plaintiffs entering into the Purported Agreement with Textron.

148. Plaintiffs entered into the Purported Agreement relying on the assumption that the communications made to them by Defendants were true or that a fact did not exist if Defendants failed to disclose it.

149. Plaintiffs' reliance on Defendants' communications was justified.

150. Plaintiffs' reliance caused them damages directly and proximately caused by Defendants' forgoing conduct in an amount to be proven at trial.

151. Because of Defendants' fraud and misrepresentation that induced Plaintiffs into the Purported Agreement, there was no true "meeting of the minds" required of a contract, and Plaintiffs' consent was induced by Defendants through Defendants' use of fraud.

## COUNT III

### Fraudulent Misrepresentation

152. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

153. Defendants communicated misrepresentations of material fact to Plaintiffs regarding Textron's business relationship with Plaintiffs and the Textron Off-Road and Arctic Cat Off-Road products, including:

(a) That Textron was looking to foster an atmosphere conducive to a long-term partnership between it and Plaintiffs;

(b) That Textron was looking to build a business together with Plaintiffs;

(c) That Textron was heavily investing in, and would continue to heavily invest in, the Arctic Cat Off Road line of powersports vehicles and the Arctic Cat Off Road powersports vehicle dealers;

(d) That Textron would aggressively market and support its network of Arctic Cat powersports vehicle dealers, including Plaintiffs;

(e) That Textron was making sure, and would continue to make sure, its dealers would have great product availability;

(f) That Textron would ensure all its dealers would operate on a fair and even playing field, and that it would not give preferential treatment or pricing to one dealer over another;

(g) That Textron would not produce its product under the false guise of a different "line make" in order to circumvent its obligations pursuant to the Purported Agreement; and

(h) That the Tracker Off Road powersports vehicles were a different line-make, when, in fact, they were identical to the Arctic Cat Off Road vehicles and were, for all intents and purposes, the same.

154. Defendants knew or had reason to know that the representations made to Plaintiffs were false or would-be false.

155. Defendants knew and intended that Plaintiffs would rely on the misrepresentations disseminated about the business relationship and products but stood to benefit from such misrepresentation because they would allow Defendants to profit from deceived powersports dealers, such as Plaintiffs.

156. Defendants stood by as Plaintiffs invested heavily in the dealership and product in reliance on the misrepresentations described in this Complaint.

157. Defendants intended that powersports dealerships, including Plaintiffs, would rely on such misrepresentations.

158. Plaintiffs were ignorant of the truth or falsity of the representations made by Defendants about the business relationship and products.

159. Plaintiffs therefore reasonably and justifiably relied on the truthfulness of the representations made, authorized, directed, and/or ratified by Defendants, who had superior knowledge, when investing in the dealership and product.

160. Plaintiffs have sustained damages directly and proximately caused by the forgoing conduct in an amount to be proven at trial.

161. Defendants acted intentionally, maliciously, and/or recklessly when they undertook the forgoing conduct, such that Plaintiffs are entitled to an award of punitive damages sufficient to punish and deter like conduct.

**COUNT IV**

**Fraudulent Concealment**

162. Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

163. Defendants, individually and through their agents, concealed material facts regarding its true plans for both Textron's business relationships with its dealers and its products, including that:

(a) Textron was forging a new business relationship with Tracker, including producing the "Tracker Off Road" version of its existing Textron/Arctic Cat Off Road product line;

(b) That the retail price of the Tracker Off Road product line would be less than the price for which Textron's Arctic Cat Off Road powersports vehicle dealers could even purchase the equivalent Arctic Cat vehicles, and significantly less than its network of Arctic Cat Off Road powersports vehicle dealers could advertise the Arctic Cat powersports vehicles;

(c) That, once the Tracker Off Road product was announced and available to the Tracker Off Road network, it would diminish the product and dealer support it had promised to its network of Textron/Arctic Cat Off Road powersports vehicle dealerships, including promotion, incentives, and product availability.

164. Defendants knew and intended that Plaintiffs would rely on the concealment of the conditions and facts set forth above to conclude that such facts and conditions did not exist.

165. Defendants benefited from the concealment of the conditions and facts set forth above because they allowed it to profit from deceived powersports vehicle dealerships, like Plaintiffs.

166. Defendants stood by as Plaintiffs invested heavily into the dealership and Defendant's product in reliance on the nondisclosure of the concealed conditions and facts described in this Complaint, pocketing the profits generated at Plaintiffs' expense.

167. Defendants intended that Plaintiffs would rely on the nondisclosure of the concealed facts as representations that the facts did not exist.

168. Plaintiffs reasonably and justifiably relied on the nondisclosure of such concealed facts when investing heaving in the dealership and Defendant's product, because Plaintiffs lacked the capacity to discover the truth.

169. Plaintiffs have sustained damages directly and proximately caused by the foregoing conduct in an amount to be proven at trial.

170. Defendants acted intentionally, maliciously, and/or recklessly when it undertook the foregoing conduct, such that Plaintiffs are entitled to an award of punitive damages sufficient to punish and deter like conduct.

## COUNT V

### Negligent Misrepresentation

171. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

172. Defendants gave false information to Plaintiffs, including:

(a) That Textron was looking to foster an atmosphere conducive to a long-term partnership between it and Plaintiffs;

(b) That Textron was looking to build a business together with Plaintiffs;

(c) That Textron was heavily investing in, and would continue to heavily invest in, the Arctic Cat Off Road line of powersports vehicles and the Arctic Cat Off Road powersports vehicle dealers;

(d) That Textron would aggressively market and support its network of Arctic Cat powersports vehicle dealers, including Plaintiffs;

(e) That Textron was making sure, and would continue to make sure, its dealers would have great product availability;

(f) That Textron would ensure all its dealers would operate on a fair and even playing field, and that it would not give preferential treatment or pricing to one dealer over another;

(g) That Textron would not produce its product under the false guise of a different "line make" in order to circumvent its obligations pursuant to the Purported Agreement; and

(h) That the Tracker Off Road powersports vehicles were a different line-make, when, in fact, they were identical to the Arctic Cat Off Road vehicles and were, for all intents and purposes, the same.

173. Defendants gave such false information to Plaintiffs in the course of Defendants' business.

174. Defendants gave such false information to Plaintiffs for Plaintiffs' guidance or use in a business transaction.

175. Defendants were negligent in communicating the information because it either knew or had reason to know the information was false.

176. Defendants gave Plaintiffs the information knowing that Plaintiffs would take action in reliance on the information.

177. Plaintiffs did so rely on the information.

178. Plaintiffs have sustained damages directly and proximately caused by the forgoing conduct in an amount to be proven at trial.

**COUNT VI**

**Violations of Colo. Rev. Stat. Ann. § 44-20-423**

179. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

180. Colorado provides powersports dealerships located within the state several causes of action pursuant to Colo. Rev. Stat. Ann § 44-20-423.

181. Defendants have violated § 44-20-423 in the following ways, as indicated in the above-pleaded facts and allegations:

(a) Defendants have coerced or attempted to coerce Plaintiffs to order unwanted product, accept unwanted product, and otherwise performs acts that are financially detrimental to Plaintiffs, under the threat of losing the Arctic Cat franchise, in violation of § 44-20-423(1)(b);

(b) Defendants have coerced or attempted to coerce Plaintiffs to accept delivery of Arctic Cat vehicles that Plaintiffs did not order, in violation of § 44-20-423(1)(c);

(c) Defendants withheld, reduced, or unreasonably delayed without just cause the delivery Arctic Cat powersports vehicles due to Plaintiffs, in violation of § 44-20-423(1)(e);

(d) Defendants failed to offer to all the same dealers all of the models it manufactured. More specifically, Defendants fraudulently claimed the line of Tracker Off Road products was a different "line make" than the Arctic Cat Off Road products, and did not offer Plaintiffs the Tracker Off Road products and pricing, in violation of § 44-20-423(1)(j)(I);

(e) Defendants coerced or attempted to coerce Plaintiffs from carrying other line-makes of new powersports vehicles, such as Kymco, in violation of § 44-20-423(1)(k);

(f) Defendants failed to pay Plaintiffs, within 90 days of the termination of Plaintiffs' franchise, any and all of the following, in violation of § 44-20-423(1)(l):

  i. Dealer cost (plus delivery and taxes) of unused and unsold vehicles in Plaintiffs' inventory that were acquired within the previous 12 months;
  ii. Plaintiffs' cost for all unused and unsold parts and accessories in original packaging;
  iii. Far market value for all Arctic Cat signage in Plaintiffs' possession;
  iv. Far market value for all special tools and equipment; and
  v. The cost of transporting, handling, packing, and loading the above.

(g) Defendants failed to pay Plaintiffs, within 90 days of the termination of Plaintiffs' franchise:

  i. The cost of the lease for the dealer facilities for one year, in violation of § 44-20-423(1)(r)(I);
  ii. The cost of any upgrades or alterations to Plaintiffs' facilities that were required by Textron within the previous 5 years, in violation of § 44-20-423(1)(u).

(h) Defendants discriminated between and refused to Plaintiffs all of the models manufactured by Arctic Cat based upon reasonable sales and service standards, in violation of § 44-20-423(1)(p);

(i) Defendants failed to make practically available the incentives, rebates, bonuses, or other similar benefits to Plaintiffs that it offered to other Colorado dealers, in violation of § 44-20-423(1)(q);

(j) Defendants sold or offered to sell essentially the same new powersports vehicles to dealers at a lower actual price than the actual price it offered to Plaintiffs, in violation of § 44-20-423(1)(x); and

(k) Defendants used unreasonable, arbitrary, and unfair performance standards in determining Plaintiffs' compliance with the Dealership Agreement, when viewed

in light of Textron's fostering of unfair competition with its Tracker Off Road strategy, in violation of § 44-20-423(1)(z).

182. Plaintiffs have sustained damages directly and proximately caused by Defendants' violation of Colo. Rev. Stat. Ann § 44-20-423 in an amount to be proven at trial.

183. Defendants acted intentionally, maliciously, and/or recklessly when they undertook the forgoing conduct, such that Plaintiffs are entitled to an award of punitive damages sufficient to punish and deter like conduct.

**COUNT VII**

**Colorado Deceptive Trade Practices in Violation of Colo. Rev. Stat. Ann. § 6-1-105**

184. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

185. Textron advertised and promoted itself to Plaintiffs under the guise of having Plaintiffs become an authorized Arctic Cat powersports vehicle dealer.

186. Textron's real purpose, however, was to first require Plaintiffs to purchase powersports vehicles from Textron, as exemplified by § 3.j of the Purported Agreement.

187. The preceding occurred in the course of Textron's business.

188. Plaintiffs did so purchase powersports vehicles from Textron.

189. When Textron's above-pleaded negligent acts required Plaintiffs to cease operations as a powersports vehicle dealership, Textron refused to buy back the product it had required Plaintiffs to purchase.

190. Plaintiffs thus sustained actual damages directly and proximately caused by Textron's violation of Colo. Rev. Stat. Ann. § 6-1-106(1)(k) in an amount to be proven at trial.

191. Textron acted intentionally, maliciously, and/or recklessly when it undertook the forgoing conduct, such that Plaintiffs are entitled to an award of punitive damages sufficient to punish and deter like conduct.

## PRAYER FOR RELIEF

192. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants in an amount to compensate them for damages Plaintiffs have suffered and will suffer, in an amount to be determined at trial, for punitive damages, for Plaintiffs' costs and disbursements in this action, including Plaintiffs' attorneys' fees as permitted under any applicable law, and expenses, for special damages, including lost profits and other consequential damages, for prejudgment and postjudgment interest on all damages as permitted under applicable law, and for all other and further relief as this Court deems just and proper. With respect to Count I of this Complaint, Plaintiffs further pray that this Court make a declaratory judgment that both the venue and choice of law provisions in the Purported Agreement authored by Defendant Textron are invalid pursuant to Colo. Rev. Stat. Ann. § 44-20-433 and are thus not controlling over Plaintiffs' claims.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request a trial by jury on all issues so triable.

Respectfully submitted,

**EDGAR LAW FIRM LLC**

Dated: January 15, 2021

*/s/ David Edgar*
David W. Edgar CO #41956
216 16th Street, Ste. 850
Denver, CO 80439
Telephone: (720) 529-0505
Facsimile: (303) 486-0001
dwe@edgarlawfirm.com

John M. Edgar *Pro Hac Vice Pending*
Ryan J. Loehr *Pro Hac Vice Pending*
2600 Grand. Suite 440
Kansas City, MO 64108
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
jme@edgarlawfirm.com
rjl@edgarlawfirm.com

ATTORNEYS FOR PLAINTIFFS

DATE FILED: January 15, 2021 1:17 PM
FILING ID: C9FE385991E5B
CASE NUMBER: 2021CV30041

# EXHIBIT A

**Expires** 12/31/2020

# Textron Specialized Vehicles
# U.S. Dealer Agreement

This U.S. Dealer Agreement ("Agreement"), dated as of 1/1/2018 ("Effective Date"), is entered into by and between Textron Specialized Vehicles Inc. (hereinafter the "Company"), having its principal place of business at 1451 Marvin Griffin Road, Augusta, Georgia 30906 and

PARKER POWERSPORTS INC. 700006604 2928786,

having a principal place of business at 15690 PARKERHOUSE RD UNIT 3E

PARKER Colorado 80134

(hereinafter the "Dealer").

WHEREAS, Dealer is authorized at the DEALER LOCATION and BRANCH LOCATIONS(S) to sell and to service selected PRODUCTS manufactured or distributed by Company in accordance with the terms of this Agreement.

WHEREAS, both parties recognize that the rights of Dealer and Company under this Agreement are defined by the terms of this Agreement and applicable law.

IN CONSIDERATION of the representations and promises contained in this Agreement, Company and Dealer agree as follows:

1. DEFINITIONS

The following definitions shall apply throughout this Agreement:

a. BRANCH LOCATION(S) shall mean the secondary place or places of business of Dealer, as agreed to by the parties in writing, designated for the sales and/or servicing of PRODUCTS under this Agreement separate from the Dealer's principal place of business.

b. DEALER LOCATION shall mean the place or places of business of the Dealer designated as

15690 PARKERHOUSE RD UNIT 3E

PARKER Colorado 80134

for sale and service of PRODUCTS, including any BRANCH LOCATION(S).

c. DEALER PRICE shall mean the price to the Dealer for PRODUCTS established by Company from time to time excluding any holdback, deposit or

charge by Company for taxes, handling, delivery, transportation or special items or services.

d. DOMESTIC shall mean within the fifty (50) states of the United States of America.

e. GENUINE PARTS shall mean new, genuine Company manufactured or sourced parts, garments, assemblies, subassemblies, components, and accessories.

f. MANUAL shall mean the Company warranty provisions associated with each PRODUCT LINE or individual VEHICLE (or the equivalent document or documents) and any amendments thereto as may be made from time to time by Company, which document is made part of this Agreement.

g. NON-EXCLUSIVE shall mean that Dealer may market and sell PRODUCT in the PAR, that other dealers may sell Company PRODUCTS to customers within the Dealer's designated PAR, and that Dealer has no actual or implied right, contractual or otherwise, to be the only Company dealer located in the designated PAR or any geographic area. Company has no actual or implied obligation, contractual or otherwise, to forgo placing a new Company dealer or dealer selling location in Dealer's designated PAR or any given geographic area, and may in fact appoint such new Company dealers or locations at any time.

h. PRIMARY AREA OF RESPONSIBILITY ("PAR") shall mean the geographic area for which Dealer has sales and service responsibility for PRODUCTS as agreed to by the parties in writing. The PAR is NON-EXCLUSIVE, and is used solely to measure the Dealer's sales performance.

i. PRINCIPAL DEALER LOCATION shall mean the DEALER LOCATION.

j. PRODUCT(S) shall mean VEHICLES and GENUINE PARTS.

k. PRODUCT AND PRICING PROGRAM shall mean the latest Company bulletin (or equivalent document or documents), which sets forth the DEALER PRICE, terms of sale, financing options and ordering procedure applicable to the sale of PRODUCTS to Dealer.

l. PRODUCT LINE(S) shall mean the following the PRODUCTS as indicated by Company below:

x Textron Off Road ATV & Related PG&A

x Textron Off Road SXS & Related PG&A

x Arctic Cat Snowmobiles & Related PG&A

___ EZGO Personal Transport Vehicles & Related PG&A

___ EZGO Low Speed Vehicles & Related PG&A

___ Cushman Industrial Vehicles & Related PG&A

___ Cushman Commercial - Shuttles - Vehicles & Related PG&A

___ Cushman Commercial - Haulers - Vehicles & Related PG&A

___ Cushman Low Speed Vehicles & Related PG&A

___ Jacobsen Professional Turf & Related PG&A

___ Pre-owned Vehicles

m. VEHICLES shall mean those models of new and used vehicles that are designated by Company and grouped by brand or vehicle type. Company reserves the absolute and sole right to determine what VEHICLES it will offer Dealer for sale.

2. APPOINTMENT

a. Company appoints Dealer as a NON-EXCLUSIVE Dealer solely for the sale and service of the designated PRODUCT LINES to DOMESTIC customers at the DEALER LOCATION and BRANCH LOCATION(S); and Dealer accepts this appointment. Under this appointment, Dealer is authorized to sell PRODUCTS to all DOMESTIC customers as described herein, with the exception of "fleet golf" customers (i.e., golf courses/resorts). For clarity, the needs of "fleet golf" customers are addressed through a separate, exclusive distributor channel. This Agreement is independent and separately enforceable for each designated PRODUCT LINE, and the use of this common Agreement is intended to simplify the execution of the Agreements. This Agreement grants Dealer no rights to purchase or sell any other Company PRODUCT LINES other than those specifically designated herein. Any sale of Company PRODUCT for export or from a location not authorized herein shall require the prior written consent of Company.

b. Dealer recognizes that PRODUCTS purchased by Dealer may not meet the requirements imposed by countries other than the United States. Accordingly, Dealer shall not sell PRODUCTS to end users in other countries or to any purchaser who purchases the same for shipment to a final destination located outside the United States unless Dealer knows that the qualified end user will use and store their PRODUCTS in the United States on a continual basis. Should Dealer violate the provisions of this paragraph, Company may assess Dealer twenty-five percent (25%) of the dealer cost of each PRODUCT that Dealer sells in violation of the terms of this paragraph. Company may withhold and/or reverse any Company incentives or

programs related to the sale of any unit that is sold in violation of the terms of this paragraph. Company shall have the right, in its sole discretion, to pay the twenty-five percent (25%) that is collected to the dealer who reported the violation or to the dealer or dealers who are most affected by the sale.

3. SALES RESPONSIBILITY

a. Dealer agrees to vigorously and aggressively promote the sale of PRODUCTS in order to assure maximum sales of PRODUCTS. Furthermore, Dealer agrees to obtain (i) a reasonable share of Dealer's designated PAR and (ii) a reasonable total sales revenue for all PRODUCTS which dealer is authorized to sell as agreed to by the parties.

b. Dealer agrees to develop, maintain and direct a sufficient number of trained, qualified sales personnel, and shall conduct aggressive advertising and sales promotion activities. Dealer sales and service personnel shall complete annual Company training associated with each PRODUCT LINE.

c. Dealer understands and agrees that its performance of its PRODUCT sales responsibility hereunder shall be measured by Company through the use of such reasonable criteria as Company may adopt, and without limitation, taking into consideration Dealer's total revenue associated with the sale of PRODUCTS or Dealer's unit sales to customers in the PAR. Company may from time to time conduct surveys (by use of questionnaires or otherwise) of owners of PRODUCTS purchased from Dealer to determine the satisfaction of those owners with the sales efforts of Dealer. The results of these surveys may be taken into consideration in assessing Dealer's performance under this Agreement.

d. Dealer shall not offer for sale or sell GENUINE PARTS, which are in fact counterfeit.

e. Company reserves the right to sell PRODUCT directly to end users within Dealer's designated PAR, to include electronic commerce, without incurring any liability to Dealer. The term "end users" shall include, but not be limited to, retail chains stores; governmental agencies, institutions or entities; educational or charitable institutions; rental companies and accounts classified by Company as national accounts. Company shall have no liability to Dealer for any sales made pursuant to this paragraph.

f. All sales of the PRODUCT made by Company to Dealer shall be in accordance with this Agreement and Company's terms and conditions of sale in effect on the date of sale (the "Terms"). In case of any inconsistency, ambiguity, or conflict between this Agreement and Company's terms and conditions of sale, the terms of this Agreement shall prevail. Company's Terms shall not be altered or modified by the provisions of any purchase order or other instrument furnished or offered by Dealer even though shipment is made by Company against such purchase order or other instrument. Company hereby rejects any term or condition in Dealer's forms or other purchase documents that are inconsistent with the Terms.

g. If Dealer sales PRODUCT outside of its PAR, Dealer shall perform the initial PRODUCT set-up and support activities as determined by Company.

h. Dealer agrees to warranty register all PRODUCTS sold hereunder.

i. Dealer agrees to purchase and maintain at all times an adequate stock of service parts and accessories approved by Company in order to provide reasonable and prompt service and repairs to the PRODUCTS.

j. Maintain a minimum model representation which shall at no time be less than the number of units reasonably established by Company, subject to availability. Dealer shall maintain an inventory of current PRODUCTS sufficient to ensure prompt delivery to customers and display PRODUCTS to the public during regular and customary business hours. Dealer agrees to provide Company with information, at Company's request, about its inventory of PRODUCTS and agrees that Company may share Dealer's inventory information with other authorized Company dealers.

k. Submit completed warranty registration forms electronically to Company immediately on the date of sale of units and will, upon Company request, provide copies of the executed owner registration forms. Warranty claims must be submitted electronically to company within ten (10) days from the date of the repair. Dealer shall also maintain all original owner registration forms containing the original signatures of the Dealer and the Dealer's customer in paper form with Dealer's other business records. Dealer shall send all original and/or electronic copies of owner registration forms to Company immediately upon request, at any time, including, but not limited to, upon termination, expiration or nonrenewal of this Agreement.

l. Be bound by any agreement between the U.S. Consumer Product Safety Commission ("CPSC") and Company.

m. Dealer shall review and explain to each retail purchaser (and appropriate members of his or her immediate family) the complete safety video and operator's manual. Dealer shall explain that adult supervision is required at all times for children of ages 6-15 years, and explain that parents should not permit use of the ATV(s) by any child lacking the ability to operate it safely even with supervision. Each purchaser and each appropriate family member must practice until successfully completing the maneuvers as described in the operator's manual and safety video before leaving the dealership with the ATV. Dealer shall also instruct the purchaser and his or her family to read the operator's manual, read all ATV hang tags and decals and watch the safety video before operating the ATV(s). Dealer shall fully complete the warranty registration form before purchaser takes possession of the ATV and is eligible for warranty, including having the purchaser read the form and sign and initial it where the warranty form indicates that a signature or initials are required. Dealer shall maintain all original warranty registration forms containing the original signatures of the purchasers in paper form with Dealer's other business records. Dealer shall send all original warranty registration forms to Company

immediately upon request, upon termination, expiration or nonrenewal of this Agreement.

n. Inform each purchaser of his or her opportunity to receive free safety training from the Recreational Off-Highway Vehicle of America ("ROHVA").

o. Dealer agrees to disseminate to purchasers all safety information provided by the Company. Dealer shall fully complete the warranty registration form before purchaser takes possession of any unit, including having the purchaser read the form and sign and initial it where the warranty form indicates that purchaser's signature or initials are required. Dealer shall maintain all original warranty registration forms containing the original signatures of the purchasers in paper form with Dealer's other business records. Dealer shall send all original warranty registration forms to Company immediately upon request, upon termination, expiration or nonrenewal of this Agreement.

p. Review and explain before the Dealer allows anyone to operate or ride on/in any of the units, to each operator and/or rider the complete safety video, PRODUCT hang tags and decals and operator's manual applicable for that unit.

q. Sell PRODUCTS only to other Company Dealers currently authorized to sell the particular PRODUCT to be sold or qualified end users. A qualified end user is any customer who is qualified to operate the PRODUCTS and purchases a PRODUCT for use, lease, or rent, but not for resale. Delivery of units is required to be made in person to the qualified end user, not through any third party, sub dealer or delivery service.

r. In addition to the responsibilities set forth herein, assemble, set-up and inspect Products to ensure that they are in suitable operating condition prior to delivery to any qualified end user. Dealer agrees to deliver and review Product features with each retail customer in person. Dealer's pre-delivery responsibilities shall survive the termination or expiration of this Agreement.

s. If Dealer repairs a Product using accessories, subassemblies, components or other parts that are not sold by Company, Dealer must inform the customer in writing that it has repaired the Product with accessories, subassemblies, components or other parts that are not sold or approved by the Company, that the use of such other parts, accessories, subassemblies, components, or modifications may make the vehicle unsafe, and that any such part, subassembly, component, or modification is not included in the warranty provided by Company.

t. Upon receipt, uncrate, assemble, and preservice, according to Company specifications, all PRODUCTS prior to completion of sale and before delivering any PRODUCT to an end user. Dealer specifically agrees that it will comply with all Set-Up and Pre-Delivery Instructions issued by Company. Dealer agrees to indemnify, defend, and hold harmless the Company for any loss or damage which results from Dealer's failure to uncrate, assemble, and pre-service the Products in accordance with Company specifications.

u. Notify Company of any changes or proposed changes in state and local laws and regulations which come to Dealer's attention concerning the manufacture and use of Products and the Company's relationship with Dealer, and notify Company of any matters which come to Dealer's attention indicating a concern for safety regarding the operation and use of Products

v. Comply with all laws and regulations as may apply within the territory in which Dealer sells Products, as applicable to this Agreement and all transactions and activities contemplated or to be performed by the Dealer under this Agreement, and shall procure and maintain all approvals, licenses, permissions, and permits necessary to the performance of its business and conduct its business in a manner so as to not bring discredit upon the reputation of the Products or the Company.

w. Refrain from the purchase of Products from dealers located outside of the United States for resale in the United States.

x. Promptly notify all applicable purchasers in the event of a recall and make any and all repairs required in connection with the recall. Dealer shall comply with all procedures specified in safety bulletins, service bulletins and/or any other documentation provided by the Company regarding any recall. Dealer agrees to indemnify and hold harmless Company against all losses, costs and attorney fees sustained by Company in the event of Dealer's failure to comply with this provision.

4. NOTICE, APPROVAL AND CONSENT

Any notice, approval or consent required or allowed under this Agreement shall be given in writing and, without prejudice to other forms of actual service, shall be considered as served upon being mailed in a properly sealed envelope with first class or certified or registered postage prepaid. Notices to Company shall be mailed to Company, 1451 Marvin Griffin Road, Augusta, Georgia 30906. Notices to Dealer shall be delivered or mailed to Dealer at the PRINCIPAL DEALER LOCATION.

5. SERVICE RESPONSIBILITY

a. General. In accordance with standards and procedures established from time to time by Company, Dealer agrees to develop, maintain and direct a sufficient number of trained and competent service mechanics and technicians necessary to render prompt, professional and courteous service to owners and users of the PRODUCTS at the DEALER LOCATION, at any BRANCH LOCATION, and in the field.

b. Pre-delivery. In accordance with instructions issued from time to time by Company, Dealer agrees to perform inspection, conditioning and repair of PRODUCTS before delivery to a purchaser.

c. Warranty and Policy. Dealer must perform warranty service on PRODUCTS sold by Dealer in accordance with the MANUAL. At the customer's request, Dealer

shall perform warranty and policy service on PRODUCTS not originally sold by Dealer.

d. Campaigns. Dealer agrees to perform campaign and field improvement program (FIP) inspections and make corrections for owners and users of PRODUCTS in accordance with instructions by Company and the provisions of the MANUAL.

e. Parts; Priority. Except as otherwise instructed by Company, Dealer agrees to use only GENUINE PARTS in performing warranty, campaign and FIP work. Further, Dealer agrees to use only GENUINE PARTS when performing repair or refurbishment work on Company produced golf cars, industrial vehicles or off-road vehicles, unless otherwise specifically requested by the customer. Dealer shall give priority to warranty, campaign and FIP work over other service work if the customer's use of the PRODUCTS submitted for warranty, campaign, or FIP work is impaired.

f. Service Tools. Dealer agrees to keep in inventory all special tools required by the Company to service the PRODUCTS.

g. Use of GENUINE PARTS with Non-Company Vehicles. The Company has determined that GENUINE PARTS may not be used in conjunction with certain Non-Company Vehicles (the "LISTED VEHICLES") because the safety profile of the LISTED VEHICLES is either unknown or unproven and the compatibility of the GENUINE PARTS with the LISTED VEHCILES is either unknown or unproven. The Company will maintain a list of such LISTED VEHICLES, which will be made available to Dealer upon request. Dealer agrees that it will not install GENUINE PARTS on any LISTED VEHICLES, use GENUINE PARTS to repair or refurbish any LISTED VEHICLES, or sell or offer for sale GENUINE PARTS in connection with any LISTED VEHICLES.

6. STOCKS

Dealer agrees to order, stock, maintain, protect from the weather and prominently display in new salable condition at each DEALER LOCATION representative models of each type of PRODUCT, which Dealer is authorized to sell hereunder. It shall be Company's sole right to determine minimum PRODUCT LINE stocking requirements.

7. ORDERS

a. Dealer shall submit orders for PRODUCTS to Company at times designated by Company and using methods and forms required by (or approved by) Company.

b. Company shall make reasonable efforts to honor each order for PRODUCTS from Dealer accepted by Company, but shall not be liable for failure to deliver or delay in delivery of PRODUCTS.

c. Orders for PRODUCTS are deemed to be accepted by Company when the order is expressly confirmed by Company or the ordered PRODUCTS are delivered to Dealer or the carrier.

d. All sales of PRODUCTS to Dealer are final, and Dealer shall accept all PRODUCTS ordered by it, whether such orders are given to Company by telephone, fax, letter, e-mail, purchase order, oral order or other communication. Further, Dealer is not authorized to cancel or return any order accepted by Company without Company's prior written authorization.

e. Notwithstanding passage of title, Company shall have all security and other rights permitted by law, including, without limitation, the right of rescission, stoppage in transit and resale.

8. PRICES AND CHARGES

Unless otherwise determined by Company, the following provisions shall apply:

a. Dealer shall pay Company the DEALER PRICE as set forth in the PRODUCT AND PRICING PROGRAM for each PRODUCT purchased from Company by Dealer, plus any charges by Company for reimbursement of taxes, duties, transportation, handling, distribution, delivery or special items or services. Company may change the DEALER PRICE, holdback, reimbursement and other charges at any time prior to acceptance of the order without prior notice to Dealer. Delivery to Dealer shall be deemed made and the order filled, on the date of delivery by Company to the carrier or to Dealer, whichever occurs first.

b. Notwithstanding anything to the contrary contained herein, if Company increases the DEALER PRICE for any PRODUCT, Dealer may cancel, by written notice to Company within ten (10) days after receipt of notice of the increase, any orders for that PRODUCT placed by Dealer prior to receiving notice of the increase and not already accepted by Company at the time Company receives Dealer's notice of cancellation.

9. TERMS OF PAYMENT AND DELIVERY

Unless otherwise determined by the Company by written notice to Dealer, the following provisions shall apply:

a. Payment. Payment for each PRODUCT shall be made in current funds unless the invoice or Company's then current and applicable payment plan provides otherwise, in which event the terms of the invoice or the plan shall govern. Dealer shall pay Company for all PRODUCTS immediately upon delivery of PRODUCTS to the carrier or Dealer, whichever occurs first. Receipt of any check, draft or other commercial paper shall not constitute payment until Company has received cash in the full amount thereof. Failure to make payment in accordance with this paragraph may, at the discretion of Company, result in Company revoking the sale and repossessing

the PRODUCT without notice or formality or result in a charge back or disallowance of discounts and/or settlement allowances. These remedies are in addition to those available to Company under Paragraphs 23(c) and (d).

b. Delivery. Company reserves the right to determine the method and routing for delivery of PRODUCTS sold to Dealer. Where specific shipping instructions are not stated in the order, Company will endeavor to ship the PRODUCTS to DEALER over the best and most economical route. Company shall not be responsible for guaranteeing shipping rates or for delays in shipments.

c. Security. No cash discount will be allowed Dealer while any indebtedness, whether secured by collateral or otherwise, is past due. Further shipments of PRODUCTS may be stopped altogether or made only on a cash basis. Dealer shall be charged and must pay interest on all accounts past due at the highest lawful rate. Dealer shall reimburse Company for any collection charges, including reasonable legal fees, in connection with any past due accounts.

d. Title. Title to each PRODUCT purchased by Dealer shall pass to Dealer or to the finance institution designated by Dealer once payment is received.

e. Risk of Loss and Claims. All risk of loss and damage to any PRODUCT purchased by Dealer from Company shall be the responsibility of Dealer. Company shall cooperate with Dealer in processing all claims for loss of or damage to PRODUCTS. Dealer shall bear all risk of loss or deterioration of, or damage to, PRODUCTS from the time delivery is tendered to Dealer. Dealer shall promptly notify the Company if any PRODUCTS are substantially damaged while in Dealer's possession.

f. Demurrage and Diversion Liability. Dealer shall pay all demurrage, storage and other charges accruing after arrival of any shipment of PRODUCTS at the designated destination. If Dealer fails or refuses for any reason to accept delivery of any PRODUCTS ordered by Dealer, Dealer shall pay Company the amount of all expenses incurred by Company in shipping PRODUCTS to Dealer and in returning PRODUCTS to the original shipping point or diverting them to another destination.

g. Taxes. Dealer represents and warrants that all PRODUCTS purchased from Company are purchased for resale to customers in the ordinary course of Dealer's business. Dealer further represents and warrants that it complies with all requirements for collection and payment of applicable sales, use and like taxes, and has provided or will provide evidence thereof to Company. These representations and warranties shall be deemed a part of each order given by Dealer to Company. Dealer agrees that, as to any PRODUCT put to a taxable use by Dealer or purchased by Dealer other than for resale, Dealer shall make timely and proper return and payment of all applicable sales, use and other taxes, and shall indemnify, defend and hold Company harmless from all claims and demand for those taxes.

h. Application of Money and Credits. Any money or credits due and payable or becoming due and payable from Company to Dealer as a result of the business dealings between the parties may, at Company's option, be applied in any order Company may determine for the satisfaction, in full or in part, of any debts, liabilities or obligation due and payable or becoming due and payable or owing from Dealer to Company, including, but not limited to past due interest due from Dealer to any financing organization for which Company may be responsible to pay in the future.

i. UCC. A UCC filing and security agreement will, at Company's option, be completed for all accounts and credit extended to the Dealer.

10. ADVERTISING, PROMOTION AND TRADE PRACTICES

a. Dealer shall refrain from business practices, advertisements and promotions that are unethical, deceptive, misleading, confusing or would likely contravene any voluntary or involuntary advertising standard or any law. Dealer shall not make directly or indirectly any false or misleading statement or representation concerning any PRODUCT or other item held for sale.

b. Dealer shall comply with all laws, rules and regulations applicable to the titling, ordering, sale and service of PRODUCTS, including without limitation those concerning safety, emissions control and customer service. With further regard to used PRODUCTS which come into its possession, Dealer agrees to inspect such PRODUCTS and bring them up to reasonably safe condition before sale.

c. Dealer may not modify any PRODUCTS without the written consent of Company.

11. LITERATURE AND INSTRUCTION

a. Dealer agrees to deliver current operation, maintenance, and warranty publications, manuals and forms to each purchaser of a PRODUCT.

b. At the time of delivery, Dealer agrees to instruct each purchaser how to safely use and operate the PRODUCT.

12. CUSTOMER HANDLING

Dealer shall promptly investigate and take appropriate corrective action to satisfy the purchaser with respect to all matters brought to its attention relating to the sale and service of the PRODUCTS, and shall promptly report to Company the details of each inquiry or complaint that Dealer cannot correct to the purchaser's satisfaction. Dealer shall also promptly notify Company of any reports of accidents or injuries involving PRODUCTS.

13. FACILITIES

a. Dealer shall establish and maintain at a location approved by Company a place of business that in Company's opinion:

(i) is of satisfactory size, layout, appearance and condition;

(ii) contains adequate space for display, sale and service of PRODUCTS, customer parking, customer waiting, office functions and storage; and

(iii) is equipped to Company's sole satisfaction in such manner as to enable Dealer to meet its obligations under this Agreement.

b. Upon receipt of written approval from Company, Dealer may establish and maintain BRANCH LOCATIONS for the sale and/or service of PRODUCTS. All requirements set forth in this Agreement, including but not limited to those set forth in Paragraph 13(a), shall apply to all BRANCH LOCATIONS.

c. Without the prior written consent of Company, Dealer shall not move or substantially modify its place or places of business or establish, directly or indirectly, any other place of business, including BRANCH LOCATIONS, for the sale or service of PRODUCTS.

d. Dealer shall keep its place or places of business open during all hours and days customary in the trade.

e. The Dealer shall set up and use at each DEALER LOCATION a Company approved computerized system for communications with Company.

14. WARRANTY

a. The warranties covering the PRODUCT LINES are set forth in the MANUAL. **DEALER SHALL REVIEW THE WRITTEN WARRANTY SET FORTH IN THE MANUAL WITH THE CUSTOMER AND REGISTER THE PRODUCTS.** Dealer shall also provide customer information for each PRODUCT sold by Dealer as requested by Company for the purposes of, but not limited to, the warranty record. Company and Dealer promptly shall fulfill their responsibilities under this warranty.

b. **EXCEPT FOR THE WARRANTY EXTENDED UNDER THIS PARAGRAPH 14, COMPANY MAKES NO REPRESENTATION OR WARRANTY OF ANY OTHER KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS OTHER THAN THAT SET FORTH IN THE COMPANY WARRANTY FOR THAT COMPANY PRODUCT, WHETHER AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR**

**ANY OTHER MATTER. THE REMEDIES SET FORTH IN THE COMPANY WARRANTY SHALL BE THE ONLY REMEDIES AVAILABLE TO ANY PERSON. UNDER NO CIRCUMSTANCES SHALL COMPANY BE SUBJECT TO ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONTINGENT DAMAGES WHATSOEVER, RELATED TO OR ARISING OUT OF THE COMPANY WARRANTY OR THE USE OF COMPANY PRODUCTS, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY OF LAW, ALL SUCH DAMAGES AND CLAIMS BEING SPECIFICALLY DISCLAIMED.**

c. Neither Dealer nor any other person shall have authority to bind Company to any other representation or warranty. Dealer shall indemnify Company, for all losses, damages, liabilities or expenses (including but not limited to reasonable attorneys' fees and litigation costs) to which Company may be put as a result of any claim under said warranty by reason of any defect caused by any act or omission of Dealer, its employees or agents, or as a result of any claim based upon a different warranty given or purported to be given by Dealer, its employees or agents. Dealer agrees to comply with all its obligations set forth in the Company warranty.

d. Company shall not be liable nor shall it defend, indemnify or in any way be obligated to assist Dealer in defense of any notice, claim, or lawsuit alleging the existence of a warranty beyond the terms identified in the Warranty.

e. The performance and administration of the warranties extended under this Paragraph 14 and the payment of claims under these warranties shall be as set forth in the MANUAL.

15. INSURANCE

a. The Dealer shall acquire and maintain at its sole cost and expense throughout the term and any renewal of this Agreement the following types of insurance issued by insurers that possess a minimum Best rating of 'A-', reasonably acceptable to Company, and licensed to operate in each state where this Agreement applies:

(i) Workers' compensation – statutory limits;

(ii) Commercial General Liability- with minimum limits of $5,000,000 per occurrence and in the aggregate; coverages shall include but not be limited to premises liability, product liability, and advertising liability. The Company shall be named as an additional insured;

(iii) Business Automobile – with minimum limits of $2,000,000 per occurrence covering Dealer's owned, leased, and rental vehicles, as well as nonowned vehicle; and

(iv) Property – replacement coverage basis and to protect the interests as they may appear of the Company.

b. The Dealer shall furnish to the Company original certificates of insurance that complies with this Paragraph 15. Deductibles and self-insured retentions remain the sole responsibility of the Dealer. The Dealer's insurance coverage shall not contain exclusion clauses (*i.e.,* barring cross-claims or cross-suits) which would preclude the Company, as an additional insured, from instituting causes of action against other insureds, or otherwise limit the Company's protections as an additional insured. Dealer shall provide reasonable notice to Company, at least thirty (30) days, prior to the cancellation, expiration or material modification of any insurance policy referenced in this Paragraph 15.

c. Dealer's insurance shall apply on a primary basis; any insurance of the Company's shall be considered noncontributory.

d. Dealer may use a combination of commercial general liability insurance and umbrella/excess liability insurance to achieve the minimum limit of liability insurance as stated in Paragraph 15(a).

e. Failure of the Dealer to comply with this Paragraph 15 shall be considered a material default.

16. CREDIT LINE AND CAPITALIZATION

a. Dealer shall at all times employ in connection with its business under this Agreement a wholesale line of credit acceptable to Company and the total investment, net working capital, and financing plans, in the amounts deemed necessary by Company for Dealer to comply with its obligations hereunder.

b. Dealer shall comply fully with the terms of any wholesale line of credit applying to sales made to Dealer, and Dealer shall make no sale or other disposition of floor planned PRODUCTS other than by normal course of business sale to a bona fide purchaser, or by wholesale transfer to another authorized Company Dealer.

17. SIGNS

Dealer shall acquire, erect and maintain a Company-approved primary identification sign to identify each DEALER LOCATION as a Dealer in PRODUCTS. These signs shall be subject to Company's approval with respect to the display of any trademark or trade name to which Company or any affiliated company is entitled.

18. REPORTS, AUDITS AND RECORDS

a. At Company's request, Dealer shall provide to Company a copy of its annual and/or current monthly financial statement prepared by or for Dealer in accordance with generally accepted accounting principles. Dealer shall also promptly submit sales reports and other business, sales and service reports and documents to Company upon

request. All statements and reports shall contain information on any BRANCH LOCATIONS. At any time, Company may request from Dealer additional or supplemental financial or other business data to assist in assessing its continuing credit risk or Dealer's compliance with the provisions of this Agreement. Company also reserves the right to obtain from time to time personal financial statements from the owner(s), partner(s), principal stockholder(s) or guarantor(s) of Dealer. Dealer will comply with all requests for such additional information immediately. Failure to provide any of the reports, records or information which are the subject of this paragraph may result in withdrawal of existing credit extensions or refusal to grant additional credit or such other actions as Company may deem appropriate, including termination of this Agreement as provided herein.

b. Dealer shall permit persons designated by Company, at reasonable times during normal business hours, to examine its place or places of business, stocks of PRODUCTS at the PRINCIPAL DEALER LOCATION and any BRANCH LOCATIONS, to check and instruct Dealer and its employees in the proper handling of warranty and other repairs and claims based thereon and to examine, copy and audit all Dealer's original records and documents relating to Dealer's business as described herein. Dealer shall maintain for at least two (2) years all original records and documents relating to all claims made upon or paid by Company including, but not limited to, warranty, policy and incentive claims. The submission of improper claims will result in a charge back against Dealer's account with Company for all improper or unsubstantiated claims. If Dealer refuses to permit an audit, fails to maintain the required records, or if it is determined that improper claims were intentionally made, the charge back will include all payments for the prior two (2) years, including any dealer settlement allowances or sales incentives. This remedy is in addition to those available to Company under Paragraph 23(d).

19. COMPANY REPRESENTATION

a. Without liability to Dealer, Company may determine the numbers, locations and sizes of Company dealers necessary for adequate sales and service representation within any geographic area, or within the PAR, and may alter Dealer's designated PAR or appoint additional Company dealers in PRODUCTS within that PAR or elsewhere. Notwithstanding any other provision of this Agreement, the decision whether to alter Dealer's designated PAR or to establish a new or additional Company Dealer shall be made by Company solely upon its own business judgment. Nothing in this Agreement shall be construed as requiring Dealer's consent to the establishment of a new or additional Dealer in any area where the Dealer markets or sell PRODUCTS or elsewhere.

b. Company may make gifts or loans of PRODUCT to purchasers within Dealer's designated PAR or otherwise without liability to Dealer. Company may also offer PRODUCTS, including new, modified and differently designed PRODUCTS, bearing

any trademarks or trade names to which Company or any other company is entitled, to selected Company Dealers or others under existing or new agreements without liability to Dealer, and without undertaking any obligation to make such PRODUCTS available to the Dealer.

c. The rights and privileges conferred to Dealer under this Agreement are not transferable, assignable or salable by Dealer, and no property right or interest, direct or indirect, is sold, conveyed or transferred to Dealer under this Agreement. Company may select the dealers it shall appoint to distribute and service PRODUCTS, and may refuse to appoint as a Dealer any purchaser or prospective purchaser of any of the shares or assets of Dealer upon the termination of this Agreement or otherwise. Dealer shall give Company sixty (60) days written notice of Dealer's intention to transfer or sell the shares or assets of the dealership.

d. Dealer has not paid any fee for this Agreement.

20. MODEL CHANGE

Without giving notice to Dealer and without incurring any liability to Dealer, Company:

a. may alter, modify or discontinue the design, construction and availability of any PRODUCT;

b. may discontinue availability in the PAR of any PRODUCT, any derivative of a PRODUCT and any version of any derivative of a PRODUCT; and

c. may market additional or replacement PRODUCTS.

21. TRADEMARKS, TRADE NAMES AND TRADE SECRETS

a. Company hereby grants to Dealer permission to use the trademarks and tradenames used by Company in connection with the advertising and sale of the PRODUCTS (the "Trademarks"). Without Company's prior consent, Dealer shall not use any Trademarks owned or used by Company or any predecessor or affiliates, as or as part of Dealer's firm, trade or corporate name and shall not permit any person, firm or corporation controlled by it or affiliated with it to do so. Such Trademarks belong to Company or its affiliates, and any such use by Dealer shall immediately cease upon termination of the business relationship between Company and Dealer.

b. When using Company's Trademarks, Dealer shall not misspell or modify the Trademarks, and shall give notice that the Trademarks are owned by Company. Any use of Company's Trademarks must be pre-approved by Company in writing. Company can reject the use of Company's Trademarks by Dealer for any reason deemed sufficient by

Company. Company retains the right, at any time, to further restrict or eliminate the use of its Trademarks by Dealer.

c. Company assumes no obligation of any kind with respect to information regarding new products and/or product concepts provided to it by Dealer, whether the information is in oral or written form. Dealer agrees that all such submissions are on a voluntary, unsolicited, and non-confidential basis and that it seeks no remuneration from Company for such submission. Dealer understands that, Company, may use any idea disclosed to it by Dealer for any purpose whatsoever and may disclose any such idea to third parties, and Dealer agrees that it neither has nor will assert any claim of ownership in any information so disclosed or any commercial embodiment of such idea that Company ultimately may create. All claims of any nature, including, but not limited to, any claims for theft and/or misappropriation of trade secrets, patent infringement, etc., arising out of Dealer's submission to Company, are hereby waived, and Dealer releases Company from any such claim and covenants not to sue for any such claim.

d. Dealer specifically acknowledges that it needs to obtain written permission from the Company to use the Company Trademarks for any internet advertising, including internet search engines, regarding Dealer.

e. Dealer's use of any Company trademark as part of a domain name must comply with the guidelines set forth in Company's Internet Trademark Policy. All Dealer domain names must be pre-approved by Company, in writing, prior to use, subject to Company's sole discretion.

f. Dealer shall not in any trading title used by the Dealer in connection with its business activities under this Agreement or in connection with any other business activity, use any name or words capable of damaging the goodwill or reputation of Company or any affiliated company or predecessor. Dealer shall promptly carry out all reasonable instructions and requests of Company issued to protect and promote the value, goodwill and reputation of any trademark or trade name to which Company or any affiliated company or predecessor is entitled.

g. Dealer hereby acknowledges the importance of the Trademarks to Company and its affiliates, and agrees that Company and its affiliates may institute appropriate proceedings against Dealer to enforce its rights hereunder. Dealer further acknowledges and agrees that Company and its affiliate companies will suffer irreparable harm from, and that money damages would not be a sufficient remedy for, any violation of the terms of this Paragraph 21. Accordingly, Dealer agrees that Company and its affiliates companies shall be entitled, without the requirement of posting a bond or other security, to seek equitable relief, including specific performance and injunctive relief as remedies for any violation. These remedies shall not be deemed to be the exclusive remedies for a violation of the terms of this Paragraph 21, but shall be in addition to all other remedies available to Company and its affiliate companies at law or in equity.

22. DURATION

Unless terminated earlier in accordance with the terms hereof, this Agreement shall continue from the date first set forth above until ________________. Dealer understands that this Agreement is of a limited duration and agrees that it has not relied on any representation regarding the continuation of this Agreement or its benefits beyond the initial term.

23. TERMINATION

It is agreed that the following shall illustrate, but in no way limit, the various grounds which shall entitle Company, at its option, and Dealer where so indicated, to terminate this Agreement prior to its expiration, and which shall entitle Company to immediate possession of all PRODUCTS for which Dealer is indebted to Company or a Company approved financing institution:

a. Replacement Agreement. In the event Company offers a new or amended form of the Agreement, Company may terminate this Agreement at any time by giving Dealer at least thirty (30) days prior written notice.

b. At Will. Company may terminate this Agreement at any time, with or without cause, after at least one hundred and eighty days (180) days prior written notice to the Dealer.

c. Breach. Except for those events set forth in Paragraph 23(d), Company shall give the Dealer notice and ninety (90) days opportunity to cure, to Company's sole satisfaction, any failure of the Dealer to fulfill any of its obligations under this Agreement. If Dealer fails to cure the breach or breaches to Company's sole satisfaction, Company may terminate this Agreement by giving Dealer ten (10) days written notice.

d. With Immediate Effect. Company may terminate this Agreement with immediate effect by giving notice to Dealer or to Dealer's legal representative in any of the following events:

(i) Any transfer or attempted transfer, without the prior written approval of Company, by Dealer of any interest in, or right, privilege, or obligation under this Agreement, or any transfer by operation of law or otherwise of the principal assets of the Dealer that are required for the conduct of its business under this Agreement, or any change, however accomplished, in the direct or indirect ownership or operating management of Dealer;

(ii) Any misrepresentation in applying for appointment as a dealer in PRODUCTS by Dealer; the submission of a fraudulent parts return or the return of parts with fraudulent packaging or labeling; the submission by Dealer to Company of a false or fraudulent application or claim, or any false statement in support thereof, for warranty, policy or campaign adjustments or for wholesale parts or sales incentives or for any other refund, credit, rebate, incentive, allowance, discount, reimbursement or

payment under any program, or the acceptance by Dealer of any payment for any work not performed by Dealer in accordance with the provision of this Agreement or the MANUAL;

(iii) Failure of Dealer to maintain one or more of Dealer's places of business open for business for a period of seven (7) or more consecutive days;

(iv) Conviction or guilty plea in a court of original jurisdiction of Dealer of a felony or of any violation of law that in Company's opinion tends to adversely affect the operation or business of Dealer or the good name, goodwill or reputation of Dealer, Company, or other dealers in PRODUCTS;

(v) Failure of Dealer to fulfill any provision of paragraph 9 or paragraph 16 or to pay Company any sum due under any agreement between Company and Dealer;

(vi) Death or physical or mental incapacity or disappearance of Dealer if Dealer is an individual, or of the principal owner of Dealer if Dealer is a legal entity other than an individual;

(vii) Insolvency of Dealer; the inability of Dealer to pay debts as they mature, whether to Company or others; the filing of a petition in bankruptcy or for reorganization, whether voluntary or involuntary; the making of an assignment by Dealer for the benefit of creditors; the appointment of a receiver, custodian or trustee for Dealer or its property; or default by Dealer in the payment of any obligation owing to Company;

(viii) Revocation or discontinuance of any guaranty of Dealer's present or future obligations to Company;

(ix) Failure of Dealer to provide the reports and/or permit the audits described in paragraph 18;

(x) Any conduct by any employee of Dealer unbecoming a reputable business person, or disagreement between any persons named therein that in the Company's opinion tends to adversely affect the operation or business of Dealer or the good name, goodwill or reputation of PRODUCTS, Dealer, Company, or other dealers in PRODUCTS; or

(xi) Conduct by any employee of Dealer that is abusive or threatening to any Company employee.

e. By Mutual Consent. Dealer's appointment may be terminated by mutual consent of Dealer and Company, evidenced by a writing signed by Dealer and Company with the effective date of such termination to be as mutually agreed upon in writing.

24. OBLIGATIONS UPON EXPIRATION OR TERMINATION

a. Upon the expiration or termination of this Agreement, Dealer shall cease to be a dealer in PRODUCTS, all orders from Dealer for PRODUCTS that have not been shipped shall be canceled without liability to either party, and Dealer promptly shall:

(i) pay Company all sums owed by Dealer to Company;

(ii) remove all signs owned or controlled by Dealer that bear any trademark or trade name of Company or any of its affiliates or predecessors;

(iii) discontinue the use of any trademark or trade name of Company or any of its affiliates or predecessors; and

(iv) cease to represent in any way that Dealer continues to be a Dealer in PRODUCTS.

b. If Dealer fails to comply with these requirements, Company may take reasonable steps to achieve compliance or the same result as would be realized by Dealer compliance and Dealer shall reimburse Company for all costs and expenses, including reasonable attorney's fees, incurred by Company in effecting or enforcing compliance. All obligations contained in Paragraph 24 shall survive the expiration or termination of this Agreement. Final settlement of Dealer's account with Company shall not be made until all requirements of this Agreement, particularly those obligations set forth in Paragraph 24(a)(i), are complied with by Dealer.

25. ACQUISITION OF CERTAIN PROPERTY UPON TERMINATION

a. Upon termination of this Agreement, Company shall have the right, but not the obligation, to repurchase all or any portion of the new, current, in original packaging, undamaged, saleable, and unused (no gas or oil shall have been added) PRODUCTS that Dealer purchased from Company pursuant to this Agreement. Such PRODUCTS may be repurchased by Company pursuant to the terms of the Company's current buy back policy, the terms of which may change from time to time. Dealer shall furnish Company a complete inventory of such PRODUCTS Dealer wishes the Company to consider for possible repurchase within thirty (30) days after termination of this Agreement. For PRODUCTS Dealer wishes the Company to consider for possible repurchase, the inventory listing must be provided after the effective date of termination and in a legible format, include product descriptions, the quantity of each item, the prices Dealer paid Company for such product, and for units, the serial number, model and designation of whether the unit is still under financing. Any inventory listing of parts, accessories, units, tools, or any other item for possible repurchase must be provided to the Company in an electronic format in the form of an Excel or other electronic spreadsheet. Handwritten

inventory lists and other lists in a non-electronic format (e.g., type written) will not be accepted. Company will provide an acceptable Excel template upon request. Dealer's failure to provide the inventory listing in an appropriate format will result in a per-line item processing charge of $25.00 USD, the aggregate total of which shall be offset against any buyback total otherwise owed to Dealer. If Company has agreed in writing to repurchase units, Dealer acknowledges that Company has no responsibility for any floorplan finance charges accruing on the agreed-upon units to be repurchased. Dealer agrees that any illuminated dealer signs which were leased to Dealer by Company, bearing Trademarks of Company shall be returned to the Company upon Termination and Dealer retains no rights, after termination or nonrenewal of this Agreement, to the use of such signs and agrees that Company may enter the Dealer's premises to obtain such signs.

b. Dealer shall return all PRODUCTS which Company desires to repurchase within thirty (30) days after notification is given by Company to Dealer. All PRODUCTS returned to Company shall be packed and loaded by Dealer and returned to the destination or destinations specified by Company. Any costs incurred by Company in discharging all or any part of Dealer's obligation under this paragraph shall be deducted from any amounts owed by Company to Dealer. Upon receipt of such PRODUCTS, Company shall count and inspect the same and shall as soon as practicable, make payment or issue credit to Dealer for all such PRODUCTS returned which meet the requirements of this Paragraph 25. Dealer also agrees that Company may deduct from the payment for any repurchased PRODUCT any amount owed to Company. Any items sent to Company for consideration of possible repurchase and which are rejected by Company for repurchase will be returned to Dealer only if the Dealer provides advance payment for shipping costs and Company handling fees.

c. All Products, whether current or non-current are historically maintained in the Company database and therefore, the database shall not be construed as representative of Company's Current Parts Catalogue. For purposes of repurchase, "Discontinued Parts" and "Superceded Parts" are considered non-current and are identified in the Company database.

26. RELATIONS AFTER EXPIRATION OR TERMINATION

Any business relations between Company and Dealer after expiration or termination of this Agreement, whether with respect to PRODUCTS or otherwise, shall not constitute a waiver of the expiration or termination of this Agreement or in any manner reinstate the contractual relationship that existed by virtue of this Agreement, and all such relations shall be governed by terms identical to the relevant provisions of this Agreement unless the parties execute a new agreement superseding this Agreement.

27. ASSIGNMENT

Upon notice to Dealer, Company may assign this Agreement and any rights and obligations under this Agreement to any affiliate of Company or to any company that

succeeds to the interests of Company. Dealer may not assign or otherwise transfer this Agreement, in whole or in part, without the written prior consent of Company.

28. LIMITATION OF LIABILITY

a. Company assumes no liability to the Dealer or any third parties with respect to the performance characteristics of the PRODUCTS which have been altered, modified, or re-manufactured by the Dealer, for any claimed failures or deficiencies in the performance in the PRODUCTS resulting, directly or indirectly, from such alterations, modifications or re-manufacturing by the Dealer, its agents and/or distributors, or any entity related to or doing business on the part of the Dealer. The Company warranty shall be null and void with respect to any PRODUCTS otherwise modified.

b. The Dealer agrees to hold harmless, defend and indemnify Company, its affiliates and their respective officers, shareholders, employees and agents against all third party claims, liabilities, demands, judgments or causes of action, whether at law or in equity, and all costs and expenses related thereto (including, but not limited to, reasonable attorneys' fees and costs), from claims and lawsuits arising from or in relation to the Dealer's: (i) alterations, modifications or re-manufacturing of the PRODUCTS; (ii) warranties (express or implied) or warranty service; (iii) infringement, directly or indirectly, of Company's or any affiliate's patents, copyrights, design protections or other intellectual property rights – or of the same such rights of any third party; (iv) unauthorized use of Company's or any affiliate's trademarks, copyrights, service marks of other licensed marks – or of the same such rights of any third party, and (v) any other breach of this Agreement or applicable law. In no event will Company ever be liable, for indirect, incidental, special, contingent or consequential damages incurred by the Dealer arising out of or related to any such breach. Except as otherwise stated, Company agrees to provide prompt written notice to the Dealer of any such claim or lawsuit and permit the Dealer a right and option to undertake and conduct the defense of any such wholly indemnified claim or lawsuit brought against Company; **provided, however,** that no settlement of any such claim or lawsuit may be entered into by the Dealer without the prior express written consent of Company.

29. AGENCY OR EMPLOYMENT RELATIONSHIP

This Agreement does not create an agency or employment relationship between Company and Dealer or any personnel of Dealer. Neither Dealer nor any personnel of Dealer shall:

a. be considered an agent or employee of Company;

b. act or attempt to act or represent himself directly or by implication as an agent of Company; or

c. assume or create or attempt to assume or create an obligation on behalf of or in the name of Company.

30. AMENDMENT AND SEPARABILITY

a. This Agreement shall not be modified or amended except by an instrument in writing of subsequent date hereto duly executed by each of the parties. Notwithstanding anything to the contrary, any amendment executed on or after the date of this Agreement, in writing and signed by both parties shall be deemed to be part of this Agreement.

b. If performance or enforcement of this Agreement is unlawful under a valid law of any jurisdiction where that performance or enforcement is to take place, the performance or enforcement will be modified to the minimum extent necessary to comply with any such law.

31. COMPLIANCE

a. Dealer acknowledges receipt of a copy of Textron's Business Conduct Guidelines ("BCGs") (*see* http://www.textron.com/resources/textron_business_conduct_04.pdf - note also that a printed version is available upon request), confirms its understanding of the provisions of the BCGs that apply to contracting parties working with Textron, and agrees to comply with those provisions in connection with its work for Company.

b. Dealer affirms that it has not and agrees that it will not, in connection with the transactions contemplated by this Agreement or in connection with any other business transactions involving Company, make or promise to make any payment or transfer anything of value, directly or indirectly, (i) to anyone working in an official capacity for a government, government entity (including employees of government corporations) or public international organization; (ii) to any political party, official of a political party or candidate; (iii) to an intermediary for payment to any of the foregoing; (iv) to any officer, director, employee or representative of any actual or potential customer of Company; (v) to any officer, director or employee of Textron Inc. or any of its affiliates; or (vi) to any other person or entity if such payment or transfer would violate the laws of the country in which made or the laws of the United States. It is the intent of the parties that no payments or transfers of value shall be made which have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining business. This Paragraph shall not, however, prohibit normal and customary business entertainment or the giving of business mementos of nominal value.

c. The U.S. Foreign Corrupt Practices Act, similar laws of other countries where applicable (together, the "Global Anti-Corruption Laws"), and related Textron policy prohibit, among other things, Textron (including its subsidiaries) and anyone acting on its behalf to make or offer payment, promise to pay, or authorize the giving of anything of value to: (i) any officer or employee of, or any person acting in an official capacity for, a government or any department, agency or corporation thereof, or any political party, party official or candidate; or (ii) any person, while knowing or having reason to know that all or a portion thereof will be offered, given or promised, directly or indirectly, to

anyone described in (i) above, for the purpose of: [a] influencing any act or decision by such person in his official capacity, or [b] inducing him to use his influence with a government to affect, either by action or inaction, any act or decision of such government to obtain or retain business for any person or secure an improper advantage. Dealer acknowledges receipt of a summary of the Global Anti-Corruption Laws (for the full text of the U.S. Foreign Corrupt Practices Act, *see* http://www.usdoj.gov/criminal/fraud/docs/statue.html), confirms its understanding of the provisions of the Global Anti-Corruption Laws, and agrees to comply with those provisions and to take no action that might cause Company to be in violation of such laws.

d. Dealer affirms that it has disclosed to Company that no director or direct or indirect owner of Dealer; and to the best of Dealer's knowledge, no employee or other person who will be involved in Dealer's work for Company, is a Government Official, political party official or candidate, or a Close Family Member of such an official or candidate. In the event that during the term of this Agreement there is a change in the information required to be disclosed in this paragraph, Dealer agrees to make immediate disclosure to Company. If, in the opinion of Company, such change substantially detracts from or increases the risks related to its relationship with Dealer, Company will have the right to require that the individual(s) who have the relevant relationships recuse themselves from any potential conflict of interest. If an owner of Dealer or a Close Family Member of an owner becomes a Government Official, political party official or candidate who Company, in its discretion, determines may have influence over any aspect of Company's business; or if such an official or candidate becomes an owner of Dealer or Close Family Member of an owner, such changes will constitute grounds for termination of this Agreement. For the purposes of this paragraph "Government Official" means any officer or employee of any government or any department, agency or instrumentality thereof, or of any government-owned or government-controlled corporation or any public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, instrumentality, corporation or public international organization. For the purposes of this paragraph, "Close Family Member" means the individual's spouse; the individual's and the spouse's parents, grandparents, siblings, children, nieces, nephews, aunts, uncles and first cousins; the spouse of any of these people; and any other individuals who share the same household with the Government Official. For any publicly-traded companies in Dealer's chain of ownership, the requirements of this paragraph apply to only owners of five percent (5%) or more of the equity in the relevant company or who are otherwise known to Dealer as owners of the relevant company.

e. Dealer hereby affirms that it will obtain the written approval of Company prior to the use, retention or appointment of any subagent, sub-representative, sub-consultant or other third party sub-intermediary in connection with the services to be provided under this Agreement, and that any such sub-intermediary will be required to comply with all applicable procedures to be appointed as an authorized intermediary of Company. Any approval of such a sub-intermediary will be conditioned on, among other things, Dealer confirming in a signed writing to be incorporated into this Agreement that the sub-

intermediary satisfies and will continue to satisfy the requirements above, and Company confirming to its own satisfaction that the information provided by Dealer and the sub-intermediary in this regard is accurate.

f. Compensation payments will be made only by check mailed to Dealer's address as noted in this Agreement, by bank transfer to Dealer's bank account in the country of that address, or by either of these methods in the country where the compensation was earned. Checks and wire transfers will be made out in the name of Dealer. Payments to Dealer are subject to all applicable laws and regulations.

g. In the event Company notifies Dealer that Company has information or belief that there may be a violation of the Global Anti-Corruption Laws by Dealer or by any subagent, sub-representative, sub-consultant or other third party sub-intermediary retained by or paid by Dealer in connection with this Agreement, Dealer agrees to respond to Company's inquiries as to the possible violation and to grant Company the right to audit Dealer's books, records and other relevant documentation. This obligation shall continue after the expiration or termination of this Agreement.

h. Dealer agrees that it will, at the request of Company certify that it has not, and to its knowledge no other person, including but not limited to every owner, director, employee, subagent, sub-representative, sub-consultant or other third party sub-intermediary of Dealer has made, offered to make, agreed to make, or authorized any payment, loan, donation or gift of money or anything else of value, directly or indirectly, to or for the benefit of any Government Official, political party, party official or candidate, or to a Close Family Member or nominee of such an official or candidate, in order to obtain or retain business, or secure any improper advantage. Dealer further agrees that should it learn of information regarding any such payment or offer, or any violation of the Global Anti-Corruption Laws or Textron's Business Conduct Guidelines in connection with Company's business, Dealer will immediately advise Company of such knowledge or suspicion. For the purposes of this paragraph "Government Official" means any officer or employee of any government or any department, agency or instrumentality thereof, or of any government-owned or government-controlled corporation or any public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, instrumentality, corporation or public international organization. For the purposes of this paragraph, "Close Family Member" means the individual's spouse; the individual's and the spouse's parents, grandparents, siblings, children, nieces, nephews, aunts, uncles and first cousins; the spouse of any of these people; and any other individuals who share the same household with the Government Official.

i. Dealer accepts and acknowledges that Company may terminate this Agreement immediately by written notice for cause, which shall include, among other circumstances: (a) material breach of any of the terms and conditions hereof; (b) fraud or misrepresentation with respect to entering into and/or the performance of this Agreement; (c) a change in the information contained in this Agreement; (d) Company learns of circumstances that give it reason to believe that Dealer has engaged in illegal conduct or

unethical business practices in connection with performance of this Agreement; or (e) Dealer or any of its owners or employees responsible for its services under this Agreement has become the target of an investigation or prosecution by any government authority for alleged corruption. Dealer shall not be entitled to receive, and hereby waives rights to, any amounts that may otherwise be owed to it under this Agreement at the time of any termination under subsection (d) of this paragraph, as well as any termination payment or compensation of any kind because of termination or non-renewal of this Agreement, and Dealer agrees that any enhancements in the value of Dealer's goodwill as a result of its relationship with Company will inure to the benefit of Company.

32. SUPERSESSION AND ENTIRE AGREEMENT

This Agreement terminates and supersedes all other agreements between the Dealer and Company for the sale and service of PRODUCTS. This Agreement contains the entire agreement and constitutes the sole and exclusive agreement between the parties with respect to its subject matter. Each party acknowledges that, except as expressly stated in this Agreement, no representation, understanding, course of conduct, custom or practice in the trade, or presumption of law or fact has been made or relied upon that has induced the execution of this Agreement, or would in any way modify any of its provisions with respect to the effectiveness, duration, expiration or termination of this Agreement or the sales or profit expectancy of Dealer. Dealer has decided to become a dealer in PRODUCTS and to make the investments necessary to become a dealer solely in reliance on its own investigation, appraisal and projection of present and future conditions and expectations and not in reliance on any statements made or documents exhibited to Dealer by Company or any affiliated company or predecessor. Dealer has read this Agreement and understands it and has had adequate opportunity to consult with legal counsel of Dealer's own choosing regarding the content and meaning of this Agreement. Dealer voluntarily has entered into this Agreement and acknowledges that each provision of this Agreement is reasonable, fair and equitable.

33. NO IMPLIED WAIVER

The waiver by either party or the failure by either party to claim a breach of any provision of this Agreement shall not constitute a waiver of any subsequent breach or affect in any way the effectiveness of that provision, unless made in writing and signed by the party to be charged.

34. DATA SECURITY

During the term of this Agreement, Dealer agrees to comply with the following data security provisions:

a. Protected Information. Dealer acknowledges that its performance under this Agreement may involve access to confidential customer information including, but not limited to, personally-identifiable information, and/or

individual financial information (collectively "Protected Information") that is subject to state or federal law/rules restricting the use or disclosure of such information. Dealer agrees to comply with all applicable federal and state laws restricting the access, use, and disclosure of Protected Information.

b. Data Breach. Dealer agrees to comply with all applicable laws that require the notification of individuals in the event of unauthorized release of Protected Information, or other event requiring notification. Immediately upon the discovery of a confirmed or suspected breach of any of Dealer's security obligations, or other event requiring notification under applicable law, Dealer agrees to the following:

   i. Dealer must report both orally and in writing to the Company. In no event shall the report be made more than two (2) business days after the Dealer knows or reasonably suspects a breach has or may have occurred. In the event of a suspected breach, Dealer shall keep the Company informed regularly of the progress of its investigation until the uncertainty is resolved.

   ii. Dealer shall defend, indemnify, and save the Company harmless from and against any claims, actions, loss, liability, damage, costs, or expenses, including but not limited to, reasonable attorneys' fees, arising from any or all data breaches. The indemnification provided hereunder includes the full costs of forensic analysis, system remediation to eliminate the cause of the data breach, and notice to affected individuals, including, but not limited to, the services of a third-party firm.

35. CONFIDENTIALITY

During the term of this Agreement, Company may disclose to Dealer certain information of a confidential nature ("Company Confidential Information"). Company Confidential Information means all know-how, drawings, blueprints, manuals, letters, notes, notebooks, sketches, formulae, memoranda, dealer pricing, sales and technical bulletins, service manuals, customer lists, agreements (including this Agreement), and all other material and specifications furnished by Company to Dealer pursuant to or in connection with this Agreement that in any way relate to the PRODUCTS and/or the Company's business. Company Confidential Information also means any proprietary information, technical data, trade secrets, or know-how of Company, but does not include any of the foregoing which has become publicly known and made generally available through no wrongful act of Dealer or of others under confidentiality obligations. Dealer agrees that any and all Company Confidential Information, whether oral or written, will remain strictly confidential. Dealer will not in any manner, directly or indirectly, disclose to any person or entity any Company Confidential Information, unless Dealer first obtains Company's consent in writing. Dealer agrees that it will not use, directly or indirectly, any Company Confidential Information without Company's express written consent.

Dealer agrees to return all Company Confidential Information upon the termination, expiration, or nonrenewal of this Agreement. Dealer further agrees that disclosure or use of Company Confidential Information could result in irreparable harm for which immediate injunctive relief would be warranted.

36. GOVERNING LAW

a. The parties agree that this Agreement has been negotiated and executed in the State of Georgia, and that any and all claims or disputes that in any way arise out of or relate to this Agreement, the negotiation or execution thereof, its performance, or the breach or enforcement thereof, or any claims or disputes that in any way concern the conduct of any party in connection with this Agreement, shall hereinafter be resolved, decided and litigated exclusively either in the applicable state court in and for Richmond County, Georgia, or in the United States District Court for the Southern District of Georgia, Augusta Division. Dealer hereby irrevocably waives any right it may have to commence any action or proceeding against Company in any other court. Dealer hereby submits to the personal jurisdiction of the aforementioned courts with respect to any claims relating to this Agreement, and irrevocably waives any rights or defenses it may have to the commencement or continuation of an action against it in the aforementioned courts based on lack of personal jurisdiction or improper or inconvenient venue. The parties acknowledge and agree that the aforementioned courts are a fair, convenient, and reasonable venue for the adjudication of any claims or disputes that may arise or exist between them. The parties agree that this clause applies to any and all claims or disputes arising from pre-contract conduct and to extra-contractual claims. The parties further acknowledge that this provision is a material term of the Agreement and that neither party has fraudulently or unfairly induced or coerced the other to agree to this provision. All judgments and orders issued by the aforementioned courts against a party may be enforced by any court in any jurisdiction in which the judgment debtor or any of its assets are located.

b. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to its conflicts of law provisions; **provided, however**, that nothing in this Paragraph 34 shall be interpreted or construed to subject the relationship of the parties herein to any regulatory statute, chapter or law if that regulation would not have applied to govern the relationship but for this provision.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

COMPANY

By: DocuSigned by: Maryellen Williams D28F85BAEA464EC...

Print Name: Maryellen Williams

Title: Contracts Administrator

Date: 9/17/2018

DEALER

By: DocuSigned by: John Allen 522DD5A9327F497...

Print Name: John Allen

Title: Owner

Date: 9/14/2018

DocuSigned by: Carol Hendrix 7E95B5D272BD48B...

DATE FILED: January 15, 2021 1:17 PM
FILING ID: C9FE385991E5B
CASE NUMBER: 2021CV30041

# EXHIBIT B

**From:** John Allen
**Sent:** Friday, January 3, 2020 9:37 AM
**To:** jranum@textron.com <jranum@textron.com>
**Subject:** Parker Powersports Closure

Good Morning Joe,
Wish I had some better news for the New Year but I think we knew what was coming. Please see attached letter. I'm sure we will be touching base on details of closing doors. Today I am pretty swamped, but if you want to touch base on Monday or later is fine.

FYI, I have 4 vehicles left. 2019 – Havoc, Trail XT, WC Sport and 2018 Trail Ltd.

Thanks

John Allen
Parker Powersports Inc.
800-509-6020
Cell: 303-981-6197

December 31, 2019

Dear Textron Specialized Vehicles,

This letter is to inform you that after careful consideration Parker Powersports Inc. will be permanently closing it's doors in approximately 60 days. There are a number of factors that have forced us to make this decision, but it is primarily due to the decline of our main franchise brand, Arctic Cat. While our dealership was one of the "lucky ones" that did not receive a termination letter this year, for all intensive purposes we felt that the decisions and directions TSV chose for Arctic Cat and it's dealer network has constructively terminated Parker Powersports and left us with no choice but to shut down our business.

Our intention for the next 60 days is to do our best to unload any remaining inventory and serialized units. The hope is that we can have a mutually beneficial agreement to part ways and Textron Speciliazed Vehicles will help in finding homes for any remaining vehicles.

Thank you for your understanding.

Sincerely,

John Allen

Parker Powersports Inc.
15690 Parkerhouse Rd. Unit 3E
Parker, CO 80134
office: 800-509-6020
cell: 303-981-6197

**Debbie R. Newill**

**From:** Kristin L. Nolte
**Sent:** Thursday, July 16, 2020 12:40 PM
**To:** Debbie R. Newill
**Subject:** FW: Leftover Vehicles

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Thursday, July 16, 2020 11:56 AM
**To:** Kristin L. Nolte <kln@edgarlawfirm.com>
**Subject:** Fw: Leftover Vehicles

---

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Tuesday, February 18, 2020 11:36 AM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** RE: Leftover Vehicles

I passed this up the ladder John.

Joe

***Joel Ranum***
*District Sales Manager – AK, CO, KS, MO, NE, OK, TX Panhandle*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Tuesday, February 18, 2020 11:12 AM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** Leftover Vehicles

Hi Joe
Just a heads up that I currently still have 2 Trails, 1 Sport, and a ZR200 left, was able to sell the Havoc. I have reached out to all the dealers left in the front range and Gary in Steamboat, CO. Doesn't seem like anyone is going to take what I have left. If Textron won't pick these units up do I just call Wells Fargo and let them know they better come get them before I close up. I may not have access to the space for much longer after the first of the month.

Thanks

John Allen
Parker Powersports Inc.
800-509-6020
Cell: 303-981-6197

**Debbie R. Newill**

**From:** Kristin L. Nolte
**Sent:** Thursday, July 16, 2020 12:40 PM
**To:** Debbie R. Newill
**Subject:** FW: Parker Powersports Closure

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Thursday, July 16, 2020 11:56 AM
**To:** Kristin L. Nolte <kln@edgarlawfirm.com>
**Subject:** Fw: Parker Powersports Closure

---

**From:** John Allen
**Sent:** Monday, March 9, 2020 11:47 AM
**To:** Peter.R.Schultz@wellsfargo.com <Peter.R.Schultz@wellsfargo.com>; Sean.Leahy@wellsfargo.com <Sean.Leahy@wellsfargo.com>
**Subject:** FW: Parker Powersports Closure

Hi Peter and Sean

Below is the last communication that I received from my DSM at Arctic Cat. As far as I understand it they really aren't abiding by CO Auto Industry Division regulations and I will be filing a complaint with the State of CO.

Regardless I made the effort to reach out to as many dealers as possible and ended paying to ship the side by side out to another dealer who would take them in PA.

That leaves me with just one vehicle, 2020 ZR 200, left. I can't find any dealer that will take it due to end of season and interest. We are officially out of the space so I took the unit to my house.

Thanks
John Allen
303-981-6197

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Thursday, February 27, 2020 5:28 PM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** FW: Parker Powersports Closure

John,

I received an answer back from legal and we'll not be collecting you product.

Joe

***Joel Ranum***

*District Sales Manager – AK, CO, KS, MO, NE, OK, TX Panhandle*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Tuesday, February 25, 2020 12:00 PM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** Parker Powersports Closure

Joe
I still have received no information or contact from anyone at Arctic Cat. I have 2 trails, 1 sports, and a ZR 200 left that I can't find any dealer that wants. We officially close at the end of the week and I'm not sure how much longer I will have access to this space.

Thanks

John Allen
Parker Powersports Inc.
800-509-6020
Cell: 303-981-6197

**Debbie R. Newill**

**From:** Kristin L. Nolte
**Sent:** Thursday, July 16, 2020 12:41 PM
**To:** Debbie R. Newill
**Subject:** FW: Vehicle Orders

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Thursday, July 16, 2020 12:05 PM
**To:** Kristin L. Nolte <kln@edgarlawfirm.com>
**Subject:** Fw: Vehicle Orders

---

**From:** John Allen
**Sent:** Wednesday, August 7, 2019 2:51 PM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** RE: Vehicle Orders

Joe, I want Arctic Cat vehicles and I would like to sell them over Kymco and over any other inferior budget brands but my operation is not to sell on price, but to sell on profit. AC vehicles are the lowest profit margin transactions on my floor and has decreased in the last 8 months. And I don't think you are offering me programs that are going to improve margins. 2020 pricing has significantly squeezed margins while increasing interest risk and offering less models.

You can paint the picture however you like but at the end of the day I'm making decisions for my business to keep the doors open. If I didn't diversify and bring in other brands and product types I would have already closed up. When it comes to investment, I assure you, I have done as much as anybody proportionately. We close up, I lose my house.

I would agree with you that I'm not a good fit for the "go forward plans' being pitched. We can ride the storm a little longer but there is no love loss if/when we need to look at losing the brand.
John Allen
Parker Powersports Inc
800-509-6020

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Wednesday, August 07, 2019 1:04 PM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** RE: Vehicle Orders

We share the same frustration John.

I will not tell you what to do. I will be straight forward and tell you how it is even if unappealing to you. I'm unable to write you a special program with the terms you want. We have what we offer all dealers.

When reviewing your competitive position make sure you compare apples to apples (MSRP to MSRP, Dealer Net to Dealer Net) as street price is a whole different creature. Dealer inventory pressure, something we are moving from, is

going to affect street price much more with other brands. I don't think you appreciate the trade-off between long flooring and small stocking levels. We are opting for the latter. Much of your email tells me that your mode of operations is to sell on price. There are many options for you to sell on that basis, even below Kymco. They will attract a certain customer and that is not the market we target. We've also seen countless times that a consumer will purchase an Arctic Cat product even though it's fundamentally the same as Kymco. This tells me they are buying a brand and the backing of a company they know.

You have made you position very clear. When I look back (and I don't keep score) I can only think of countless times I've done what I can to aid, assist and ease your burden and numerous ways. Last month the issue was that we asked you take 2 non-current units, just like every other dealer, to fill a, based on your retail, a known hole in your inventory and at the same time help us all get to the operating position we all prefer to be in. You said no, and them some. As such, I'm in a defenseless position when I'm asked "why is Parker not participating?" If I provide your answer, I'm confident I'll be asked if we are the right business partners. Is it possible you don't understand the giant investment we've made as your business partner to work this inventory down and set up a go forward operation that is much better for all involved. Even if you don't have an inventory problem do you understand how the continued reduction in inventory is and will continue to improved our products value in the market place. Simple supply and demand.

I'll end as I began. I don't tell you what to do. I recommend what your should do as our business partner and yes, I defend our go forward plans.

Your TRV and 570 order is placed. You should have an email copy.

Joe

***Joel Ranum***
*District Sales Manager – CO, NE, SD, ND*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Monday, August 5, 2019 6:19 PM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** RE: Vehicle Orders

Hi Joe
My frustration is your attitude that I should be grateful that Textron is still willing to do business with me. It should be the other way around, I'm your customer and buy from you. We are not treated this way by any other manufacturers. Yes my retail decline with Arctic Cat/Textron is of great concern to me as well. Yes some of this can be attributed to replacing floorspace with Kymco but some of that blame is Textron forced that move with limited vehicle availability, poor consumer financing, poor communication, poor flooring terms, and poor business decisions that have led to a decline in customers wanting AC.

I have sold over a dozen VLX, I sold 22 Alterra 500s/450s. You no longer supply these vehicles or anything comp. so I went to the source that could. In addition I sold 16 WC Trails and now those are not available either. In the last year we went from 180 day flooring minimum in most cases to 60 days for new products. Hell, it usually takes 2-3 weeks to

receive the product that it is billed to me. Sure I compete against Polaris, CanAm, and Honda, but we have DIFFERENT vehicles! You can't keep downplaying the fact Tracker Offroad are the SAME vehicles. Consumers know and are comparing. Also the 570s are not priced at a good value. A new Polaris 570 EPS is sold for $6899 all day long. Yes the one we have for $8999 has some upgrades but it still puts us overpriced, with worse flooring terms, and higher consumer financing than the competition. You want me to justify a Prowler Pro with an MSRP of $14,999 when they have it at Bass Pro for $11,374. Yeah, I tell them a roof, winch, bumper, and better service for $3625 more they will laugh at me right out the door.

We have already been thru this argument and hashing over this VSM compliance is pointless. I'm not ordering 2 year old models at 2 year old pricing to be VSM compliant. You are comparing to retail sales in a reality that doesn't exist anymore and everything has changed. I will be ordering and retailing less vehicles going forward for all the factors listed above. It's insane to think it would stay the same! Under current pricing and ordering terms it is not profitable for me to order anything from Arctic Cat that has an equivalent Kymco counterpart. No youth, no Prowler 500s. In addition, I have to be very select in ordering UTVs at 60 days so I don't get put under by interest payments. Very seldom do I have 60 day turnover on Prowler Pros, Stampede, and Havocs. Many of these vehicles I have paid interest on.

Unless Textron changes their programs I don't see a business relationship lasting either. Frankly you are so far out left field on what you think I should accept and be grateful that I'm scared to do any business with you. I'm stuck between a rock and a hard place.

So I'm going to stick with a 2020 TRV 700 and 2020 570 EPS at this time. Frustratingly if we are stucke with 60 days flooring they should only bill to our account within 7 days of receiving and not take a 1-2 months to get.

Thanks
John Allen
Parker Powersports Inc
800-509-6020

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Monday, August 05, 2019 3:00 PM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** RE: Vehicle Orders

John,

This order request is too late to affect your VSM for July and as you state, you are non-compliant.

My frustration is that I have many dealers who would be grateful to be afforded your status and opportunity. I stuck my neck out and told management you had the potential become the largest retailer in Colorado. They agreed to proceed with your dealership. Your retail decline with AC is of great concern. It tells me you are, at least in part, replacing AC sales with your other brand. This is a poor recipe for prolonged success with us. Our ask is small and simple: maintain the inventory to match last year's 90 day retail period; and then retail it. Obviously, we want to encourage and support growth, but it's not a demand.

I've explained in detail how we will be operating going forward. We still have non-current product to sell through to be able to operate as we desire. This will take many months and we request and expect our remaining business partners will participate in clearing it, which is to everyone's benefit.

You mention competition with Tracker Pricing. I don't have hard data, but I suspect if Tracker sells one unit in your area, Polaris sells a Thousand. Focus you energy to compete with them CanAm and Honda. That's where you'll gain sales.

Attached is you August VSM. You remain 2 700's short. A 2020 700 doesn't show up on a near projection for production and is not offered. You will also note future requirement to be filled in Sept so you can plan. Our non-current inventory is limited and declining. From time to time we will see different items come available as we receive and produce products. This program deals in now.

I can place your order, but as you see it does not obtain compliance for August. You have the option to transfer product.

Let me who you plan to proceed.

Joe

***Joel Ranum***
*District Sales Manager – CO, NE, SD, ND*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Friday, August 2, 2019 10:21 AM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** Vehicle Orders

Hi Joe

At this time we will only order 1- 2020 TRV700 (A2020TKT1PUSD) and 1- 2020 570 EPS (A2020XCO4EUSD) and opt to not be in VSM Compliance. I do not want the Alpine kits.

We have taken in approx. a dozen vehicles the last 45 days from some of the backyard sales, etc. I will also continue to try and do dealer transfers where it makes sense. I am still waiting on word from Trevor on what inventory he has left from NO-CO.

The current atmosphere Textron has created is making it very difficult to operate profitably. So far this year, vehicles sales from Arctic Cat/Textron were down 25% but my business as a whole is up 35%. The vehicle margins, ordering structure, marketing efforts, and consumer confidence for AC/Textron vehicles have all deteriorated considerably. I have continued to work with Textron just hoping that more rational minds will prevail before we are forced to part ways.

I am fully aware of the threat of losing the franchise based on your communication. The talk of wanting better "partnerships" is a feeling I can relate to.
Thanks

John Allen
Parker Powersports Inc.
800-509-6020

**Debbie R. Newill**

**From:** Kristin L. Nolte
**Sent:** Thursday, July 16, 2020 12:41 PM
**To:** Debbie R. Newill
**Subject:** FW: Sept VSM

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Thursday, July 16, 2020 12:02 PM
**To:** Kristin L. Nolte <kln@edgarlawfirm.com>
**Subject:** Fw: Sept VSM

---

**From:** John Allen
**Sent:** Tuesday, September 24, 2019 9:18 AM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** RE: Sept VSM

Good Morning Joe,
Sorry I was out of town for the weekend and travelling yesterday and my phone died. Should be all good now.

We will not be placing a VSM order. We have gone over this but my position hasn't changed. Between only 60 days flooring and it taking 2 months to get vehicles that are on order I am really reluctant to order any more dirt right now. I have a 700 TRV and 570 I'm waiting on. I am no longer going to be ordering Prowler 500s or Youth ATVs from Arctic Cat and I currently have 2 WC XX that are up on interest so it really doesn't make sense for me to order more of those.

Thanks
John Allen
Parker Powersports Inc
800-509-6020

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Tuesday, September 24, 2019 8:16 AM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** Sept VSM

John,

I attempt to leave you a message yesterday but your mailbox was full.

I'm following up on the Sept VSM for compliance. You're shown as 5 units short for this month.

Please let me know if you are placing the order.

Joe

***Joel Ranum***
*District Sales Manager – CO, NE, SD, ND*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**Debbie R. Newill**

**From:** Kristin L. Nolte
**Sent:** Thursday, July 16, 2020 12:40 PM
**To:** Debbie R. Newill
**Subject:** FW: Oct VSM

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Thursday, July 16, 2020 12:01 PM
**To:** Kristin L. Nolte <kln@edgarlawfirm.com>
**Subject:** Fw: Oct VSM

---

**From:** John Allen
**Sent:** Tuesday, October 8, 2019 6:23 PM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** RE: Oct VSM

Not too much of a mystery, I talk to other dealers and checked out most of the CO dealer websites to see what they were promoting. I guess, If I am way off then I am your only dealer that actually advertises and promotes what they have, go figure.

I am interested in 2020 product line if they move and I can make money, I am waiting on my 3rd that I ordered 2 months ago.. For Side-by-Sides I have 2019s in Havoc, Stampedes, Sports, Trails, and XX that I need to sell first.

John

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Tuesday, October 08, 2019 5:22 PM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** RE: Oct VSM

I'm not sure where your data comes from John. You could have done phone survey. If you used COMS, it will only tell you if they have a model, not how many and I believe you would have to enter every available model number to get even that reduced number which would take time.

Though I can't share other dealers data with you, I can assure you yours is incorrect and that does not include unshipped orders.

You boasted to me of your 24 unit Kymco order you just placed. Considering you current inventory level and the flexibility I offered you in the mix on your 6 unit compliance order, I thought you might be interested.

Since you are not interested in representing our 2020 model line, I think it's a good strategy for you to sell down.

Joe

***Joel Ranum***
*District Sales Manager – CO, NE, SD, ND*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Tuesday, October 8, 2019 5:05 PM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** RE: Oct VSM

Hi Joe

No, I don't plan on becoming VSM compliant as it doesn't make any sense. You actually did not give me a lot of options. You strongly suggested I come up with an exist strategy if I didn't become compliant but I did not think VSM compliance was a requirement? I do plan on trying to sell down my current units before ordering new 2020s to help avoid interest and can see how the next 6-12 months pan out.

Looking at all your other dealers in the state we are above average in the amount of dirt products currently carried and actually have the largest 2019 vehicle mix in CO. Currently I only see 6-2020 models being represented in the whole state.. Are you expecting all the dealers to exit who are not in VSM compliance?

My plan is to continue to run my business as best I can trying to remain profitable. We can sell product and have a great attitude when we have a partner that helps us make money. We did 1.5 million and 130 units in 2 years and were poised to grow and have any everything but Textron products. If you don't see that the recent decline isn't attributed to you, Textron, and their new directions you are very mistaken.

Thanks
John Allen
Parker Powersports Inc.
800-509-6020

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Tuesday, October 08, 2019 12:15 PM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** Oct VSM

Hi John,

Attached is your Oct VSM. In our meeting last week we discussed various options for compliance.

Let me know if you wish to become compliant or if you plan is to sell down to exit.

Thanks

Joe

***Joel Ranum***
*District Sales Manager – CO, NE, SD, ND*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**Debbie R. Newill**

**From:** Kristin L. Nolte
**Sent:** Thursday, July 16, 2020 12:40 PM
**To:** Debbie R. Newill
**Subject:** FW: VSM

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Thursday, July 16, 2020 11:58 AM
**To:** Kristin L. Nolte <kln@edgarlawfirm.com>
**Subject:** Fw: VSM

---

**From:** John Allen
**Sent:** Tuesday, November 12, 2019 11:33 AM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** RE: VSM

If the 5% Arctic Cat Compliance bonus is no longer paid if we are not VSM compliance, you are just making that more difficult to justify ordering any vehicles.

I have 2020 Alterra 570 that was ordered and received before this change, would I still get "Arctic Cat Compliance bonus" funds for this machine if sold in the 60 day window?

I sure hope we still get the 5% bonus for the TRV we sold back on Oct 10th vin 4UF20ATV3LT200078

John Allen
Parker Powersports Inc.
800-509-6020

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Tuesday, November 12, 2019 10:49 AM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** RE: VSM

None of those were in saleable condition and shouldn't have been on the order form.

Just the 2018 Camo's left.

You need to be VSM compliant to obtain the bonus dollars.

Joe

***Joel Ranum***

*District Sales Manager – CO, NE, SD, ND*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Tuesday, November 12, 2019 10:39 AM
**To:** Ranum, Joel <jranum@textron.com>
**Subject:** RE: VSM

Hi Joe
Got your message. I realize I only have 8 units on the floor but I am not going to be able to be VSM compliant, I see that we are not eligible for rebate now either. Would we still get the AC Advantage funds if sold in 60 days though?

I notice on the sheet you still have 2019 Alterra 700 XT units on the order list. I just got off the phone with the government buyer and they are still trying to complete this bid of 4 units. They have decided they only want 19s. Are there still 4 of these available. And if so what is the ETA that they would show up here?

Thanks
John Allen
Parker Powersports Inc.
800-509-6020

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Thursday, November 07, 2019 3:19 PM
**To:** John Allen <john@parkerpowersports.com>
**Subject:** VSM

Hi John,

Here is you VSM. With no prior order your accumulation of units is at 7. You can mix and match.

Joe

***Joel Ranum***
*District Sales Manager – CO, NE, SD, ND*
*706-765-8534*
*jranum@textron.com*
601 Brooks Ave S, PO Box 810
Thief River Falls, MN 56701

ARCTIC CAT

**Debbie R. Newill**

**From:** Kristin L. Nolte
**Sent:** Thursday, July 16, 2020 12:41 PM
**To:** Debbie R. Newill
**Subject:** FW: Re organization

**From:** John Allen <john@parkerpowersports.com>
**Sent:** Thursday, July 16, 2020 12:09 PM
**To:** Kristin L. Nolte <kln@edgarlawfirm.com>
**Subject:** Fw: Re organization

---

**From:** Ranum, Joel <jranum@textron.com>
**Sent:** Monday, January 14, 2019 10:34 AM
**Cc:** Miller, Colleen <cmiller02@textron.com>; Salazar, Gil <gsalazar@textron.com>; Plemmons, Mickey <mplemmons@textron.com>; Jones, Don <djones@textron.com>; Klosterman, Joseph <jklosterman@textron.com>
**Subject:** Re organization

Hi All,

Many of you have already heard there has been a significant reorganization within the company and many folks were let go last week. There will be people picking up the responsibilities of those departing so we'll all need to get acquainted with some new folks.

I'm still here but will be working a more specified group of dealers with a changed geography. I now only handle dealers who had the legacy Arctic Cat Snow and Dirt products. I no longer work the EZGO and Cushman products or parts. Since there are no snow dealers in New Mexico I will no longer be the servicing rep for your area. I'm going to list as best I can the people who will be serving your accounts. There is some tweaking on this so I suggest you await contact from you new representative. I will be handling dirt and snow for any dealer who has Snow Product lines in CO, NE, or the Dakota's and am back to reporting to Joe Klosterman. I still handle our rental accounts.

**Colleen Miller: cmiller02@textron.com 612-386-6325.** Colleen will likely have the lion's share of the NM Dealer group. Some of you may know Colleen from her marketing support days. She been with us as a DSM in the SW for several years and proven herself to be a hard-working and conscientious DSM. From what I know her dealers love her and you will too.

**Gil Salazar: gsalazar@textron.com 619-402-6046.** Gil may get a portion of the TOR Only Dealers in CO & NM. Gil came to TOR from Cushman and will be picking up heavier responsibilities for the Cushman product lines. Gil is an astute operator and absolutely loves our off road product, especially the WC XX.

**Mickey Plemmons: mplemmons@textron.com** I don't have Mickey's number. I anticipate Mickey will hand all the of the NE dealers except Ag Sales & Service who I'll have because they handle snow. Excepting a short break, Mickey has been with us for many years. I don't have much direct work experience with Mickey but can tell you he's a great guy and a wonderful sense of humor and I'm sure you'll enjoy him.

**Don Jones:** djones@textron.com **281-229-9940** Don will take over the EZGO business for Colorado and New Mexico. Don's 36 + years with EZGO make him the authority on this product. He'll respond to your questions and bring you the best answers. You're in good hands with Don.

**Parts Reps:** You will all be assigned a parts rep. Unfortunately I have no knowledge of their territories so we'll wait for them to inform us.

I'm sure this will seem confusing for a some of you for a while, but it will whittle down to a DSM and a Parts rep for the majority of you. The thinking is to get the most expertise with our staff dealing with the products you carry to help drive retail. Scott Ernest and the executive team are committed to making this a profitable business for both of us. There will be bumpy times ahead and many bugs to work out, but with your patience and assistance, we'll all get through it.

For the majority of you I still have, I'm glad. For those of you I'm losing, I'll miss you and look forward to visiting from time to time.

For Everyone...Focus on retail and getting your inventory down. It's the best thing you can do right now.

Thanks

Joe

***Joel Ranum***
*District Sales Manager – CO, NM, Western NE, El Paso TX*
*706-765-8534*
*jranum@textron.com*

TEXTRON SPECIALIZED VEHICLES E-Z-GO TEXTRON OFF ROAD ARCTIC CAT